In re HEMINGWAY TRANSPORT, INC., Bristol Terminals, Inc., Debtors.

JUNIPER DEVELOPMENT GROUP, a Massachusetts Partnership and George D. Whitten, Amy Whitten, and Charles Whitten as Trustees of the 60 Olympia Nominee Trust, Plaintiffs,

v.

Herbert KAHN, Trustee for Hemingway Transport, Inc. and Bristol Terminals, Inc., Defendants.

Bankruptcy Nos. 82–1340–JNG, 82–1341–JNG.
Adv. No. 86–1081–JNG.

United States Bankruptcy Court, D. Massachusetts.

May 8, 1987.

Louis S. Massery, Cooley, Manion, Moore & Jones, P.C., Boston, Mass., for plaintiffs.

Judy K. Mencher, Goodwin Procter & Hoar, Boston, Mass., for defendants.

MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

## INTRODUCTION

The matter before the Court is the Motion for Summary Judgment filed by the Chapter 7 Trustee of Hemingway Transport, Inc. and Bristol Terminals, Inc. (collectively, the "Debtor" or "Hemingway"). The motion, which raises an issue of first impression in this Court, arises out of an action brought by the above named plaintiffs (collectively, the "Plaintiff" or "Juniper") against the Trustee, seeking damages and equitable rescission in connection with the purchase of the land and buildings (a trucking terminal and approximately 21.4 acres land) known as 60 Olympia Avenue, Woburn, Massachusetts from the Debtor while the Debtor was in Chapter 11.[1]

Juniper's complaint contains three counts that are predicated upon the following allegations:

1) that the Debtor, on or about May 18, 1983, sold the property to Juniper free and clear of all liens and encumberances;

2) that, at the time of the sale, the Debtor knew or had reason to know that an administrative order had been issued by the Massachusetts Department of Environmental Quality Engineering (the "DEQE"), requiring the Debtor to clean up approximately twelve barrels of hazardous wastes on an isolated portion of the Debtor's property;

3) that both the Bankruptcy Court and the United States District Court for the District of Massachusetts authorized the May 18th sale;

4) that the Debtor concealed the DEQE order from Juniper; and

5) that the United States Environmental Protection Agency (the "EPA") discovered the barrels in September of 1985 and subsequently issued an administrative order requiring Juniper to remove the barrels and to perform investigative work.[2]

In count I, Juniper alleges that the Trustee is a potentially responsible party under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C.A. §§ 9601–9657 (West 1983 & Supp.1987) ("CERCLA"). Juniper seeks contribution from the Trustee for all or part of the past and future costs of cleanup in that count. In count II, Juniper alleges fraud and breach of warranties on the part of the Debtor in conjunction with the sale. It seeks judgment in indemnity for all present and future costs of cleanup in count II. As an alternative remedy, Juniper, in count III, alleges a fraudulent conveyance and seeks rescission of the sale and the return of the purchase price and other expenses incident to the sale.

In response to Juniper's allegations and claims, the Trustee asks the Court for summary judgment against Juniper. The Trustee asserts that there are no material facts in dispute and that:

1. the Court lacks subject matter jurisdiction to hear the CERCLA cause of action because the Plaintiff has not complied with the presuit requirements of that Act;

2. the Plaintiff has, at most, an unsecured claim against the Debtor's estates if the Debtor is a "potentially responsible party" under CERCLA and therefore the appropriate remedy is a request to file a late proof of claim;

3. the Plaintiff has failed to allege fraud with particularity as required under Fed.R.Civ.P. 9(b);

4. the Plaintiff's breach of warranty claim fails as a matter of law because no lien or encumbrance was ever placed on the property under Mass.Gen.Laws ch. 21E; and Plaintiff purchased the property without warranties and specifically

---

**1.** The docket reveals that the Chapter 11 cases, which were filed on July 28, 1982, were converted to cases under Chapter 7 on November 28, 1983. The Trustee was appointed one day later.

**2.** Prior to the filing of the instant adversary proceeding, George Whitten d/b/a 60 Olympia Avenue Nominee Trust filed a "Motion for Stay

of Bankruptcy Proceedings" with a copy of the EPA order attached. The order identified a number of harmful chemicals that were discovered in the drums and in the soil surrounding the drums during an EPA site inspection in September of 1985.

subject to environmental and other applicable laws; and

5. the Plaintiff's fraudulent transfer claim based on Mass.Gen.Laws ch. 21C, § 7 fails because that provision only applies to facilities licensed to treat, store, or dispose of hazardous waste.

Under Fed.R.Civ.P. 56(c), which is made applicable to this adversary proceeding by Bankruptcy Rule 7056, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The Supreme Court has recently ruled that Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* — U.S. ——, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

With respect to the first of the Trustee's arguments as to the appropriateness of summary judgment, the Court ruled from the bench that the 60 day notice requirement contained in section 112(a) of CERCLA, 42 U.S.C. § 9612(a), an ostensible presuit requirement with which Juniper did not comply, is inapplicable to a claim under

section 107(a) of CERCLA, 42 U.S.C. § 9607(a), citing the recent First Circuit Court of Appeals decision in *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1077 (1st Cir.1986). *See also State of New York v. General Electric Co.,* 592 F.Supp. 291, 300 (N.D.N.Y. 1984). As a consequence, the Trustee's jurisdictional argument need not be addressed in this memorandum.

I

■ Without conceding that the Debtor is a responsible party under CERCLA, the Trustee, with respect to count I of Juniper's complaint, maintains that even if Juniper has a valid claim under 42 U.S.C. § 9607(a)[3] it would be a general unsecured claim. According to the Trustee, in order for Juniper to be able to seek response costs from the Debtor it must establish that the chemicals in the drums, which have been removed from the property, are hazardous substances and that the Debtor owned or operated the facility at the time the drums were deposited there. The Trustee notes that, pursuant to 42 U.S.C. § 9607(a)(2), Juniper neither alleged nor offered proof that the Debtor owned or operated the facility (defined at 42 U.S.C. § 9601(9) as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise comes to be located ...") at the time the

3. Section 9607(a) provides in relevant part:
Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
(1) the owner and operator of a vessel or a facility,
(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or

sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—
(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian Tribe not inconsistent with the national contingency plan;
(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;
(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release;
(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.
11 U.S.C. § 9607(a).

drums were placed on the Woburn property. However, the Trustee does not deny that the Debtor owned the property at the time the barrels were deposited on the property.

The Court observes initially that the Trustee is correct in pointing out that the Plaintiff has failed to allege that the Debtor owned the Woburn site at the time the drums were placed on the property. The Court, therefore, will assume for purposes of this opinion that Juniper will amend its complaint to include this necessary averment. In view of Juniper's assiduous defense of the summary judgment motion, the Court presumes that its failure to make this allegation was an oversight.

Citing *In re Wall Tube and Metal Products Co.*, 56 B.R. 918 (E.D.Tenn.1986), the Trustee next asserts that even if Juniper could prove that the Debtor is a responsible party, the Court could find that because the drums were placed on the property prior to the filing of the petition on July 28, 1982, any response cost claim would be a general unsecured claim. The Trustee also cites *In re Wall Tube and Metal Products Co.* for the proposition that once property is no longer property of the estate, expenses incurred in connection with the removal of hazardous waste from it cannot be administrative costs of preserving the estate. 56 B.R. at 924.

Juniper, in its memorandum, criticizes the Trustee for suggesting, at least implicitly, that response costs cannot be recovered from a trustee due to lack of ownership. Relying on *In re T.P. Long Chemical, Inc.*, 45 B.R. 278 (N.D.Ohio 1985), Juniper maintains that once the hazardous waste became the property of the estate, the estate became potentially liable as a person under CERCLA. Juniper also maintains that the costs of removing the hazardous waste from the Woburn site are entitled to administrative expense priority as actual and necessary costs of preserving the estate. *See* 11 U.S.C. § 503(b) and 507(a). In support of its position, Juniper insists that the Trustee and the estate became liable for the toxic waste cleanup at least one year prior to the May 18, 1983 sale when the DEQE issued an administrative order requiring the cleanup of the hazardous waste on the site.

By way of background, section 9607(a)(2)(A), (B) of CERCLA expressly creates a private cause of action for damages. *NL Industries, Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986); *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 890 (9th Cir.1986). It imposes a strict liability standard. *United States v. Price*, 577 F.Supp. 1103 (D.N.J.1983). In *Price* the court noted:

> [A]lthough the term "strict" was deleted at the last minute, it still appears that Congress intended to impose a strict liability standard subject only to the affirmative defenses listed in § 107(b). This conclusion is reinforced by virtue of the fact that Congress left the "due care" defense in the statute, a defense which would be rendered meaningless in the absence of strict liability. Moreover, the strict liability standard fits most closely with the legislative aims of CERCLA which include goals such as cost spreading and assurance that responsible parties bear the cost of the clean up. The fulfillment of these Congressional goals is more likely to be effectuated if the defendants who allegedly contributed to the environmental mess are now held to a very stringent standard of liability. Though strict liability may impose harsh results on certain defendants, it is the most equitable solution in view of the alternative—forcing those who bear no responsibility for causing the damage, the taxpayers, to shoulder the full cost of the clean up.

577 F.2d at 1113–14 (citations and footnote omitted). *See also State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1042 (2d Cir.1985); *United States v. Dickerson*, 640 F.Supp. 448, 451 (D.Md.1986); *In re T.P. Long Chemical, Inc.*, 45 B.R. 278 (N.D.Ohio 1985).

■ To be liable under CERCLA, an owner or operator must be a person, i.e., "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Govern-

ment, State, municipality, commission, political subdivision of a State, or an interstate body." 42 U.S.C. § 9601(21). Courts generally have held that the liability provisions of CERCLA should be broadly construed. *In re T.P. Long Chemical, Inc.,* 45 B.R. at 283. Accordingly, a debtor and a debtor's estate are persons as defined in CERCLA. *Id.* at 284.

■ With respect to any suggestion that the Trustee is not a proper party due to lack of ownership, the court in *Long Chemical* discussed at length the question of whether a claim under 42 U.S.C. § 9607(a) is a claim against the estate or a claim against the trustee. In holding that the EPA had a claim against the estate and not against the trustee, the court stated:

> The trustee, pursuant to section 323 of the Bankruptcy Code, is the representative of the estate. As such he can sue or be sued. Although the trustee does not hold title to the estate property, the Bankruptcy Code does provide him with certain powers associated with ownership. Chief among these powers is the power to use, sell, or lease property of the estate as provided in section 363 of the Bankruptcy Code.
> Another power which the trustee has under the Bankruptcy Code is the power to operate the debtor's business. This power applies to both a Chapter 11 trustee and a Chapter 7 trustee.

*Id.* at 283. This Court notes that the Chapter 7 Trustee in the instant case was not involved in the sale of the Olympia Avenue property. However, the Court agrees with the reasoning of Judge White in *Long Chemical* with respect to the propriety of Juniper bringing suit against the Trustee with respect to its claim against the estate.

Turning to the status of Juniper's section 9607(a) claim as an administrative or prepetition unsecured claim, the Court is confronted with a seemingly intractable problem. The problem results from two competing governmental concerns, namely concern for debtors and concern for the environment. This Court is not the first to note that the policy of giving debtors a "fresh start" and preserving and equitably distributing their assets may conflict with the policy of protecting and removing hazardous wastes from the environment. *See generally Penn Terra, Ltd. v. Department of Environmental Resources,* 733 F.2d 267, 269 (3d Cir.1984); *In re Distrigas Corp.,* 66 B.R. 382, 384 (Bankr.D.Mass. 1986). Two recent United States Supreme Court cases teach that where possible the two objectives should be reconciled. *See Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986); *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1984). Nevertheless, the question of priority status for environmental cleanup costs incurred postpetition has not been directly answered or addressed by the Supreme Court. *In re Pierce Coal and Construction, Inc.,* 65 B.R. 521, 530 (Bankr.N.D.W. Va.1986).

Courts have addressed a variety of questions raised by the interaction of the Bankruptcy Code and environmental statutes such as CERCLA, including questions regarding the dischargeability of cleanup obligations, the trustee's power to abandon property containing hazardous wastes and the application of the automatic stay to enforcement actions by state and federal environmental agencies. The two cases relied upon by the Trustee and Juniper and other cases that the Court will consider with respect to environmental cleanup costs as administrative expenses provide the Court with guidance and warrant an in-depth examination.

In *In re T.P. Long Chemical, Inc.,* 45 B.R. 278 (Bankr.N.D.Ohio 1985), the court determined that response costs incurred by the EPA in cleaning up hazardous wastes were entitled to priority as administrative expenses. The EPA's cleanup expenses were incurred postpetition and involved the cleanup and removal of buried drums and surrounding soil. The court found that the drums were unquestionably property of the bankruptcy estate and that they fell within CERCLA's broad definition of a facility. Accordingly, the Court determined that the estate was liable under section 107(a) of

CERCLA. The court rejected the trustee's argument that since the drums were not sold with the rest of the debtor's property at an estate auction, they must be deemed abandoned. The court stated:

[O]nce the drums became property of the estate, the estate became potentially liable under CERCLA. This liability is based on the estate's relationship to the drums, but is independent of the drums themselves. Subsequent abandonment or transfer of the drums does not transfer the estate's liability.

45 B.R. at 285. The Court relied on section 107(e)(1) of CERCLA to support its position. That section provides:

(1) No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

(2) Nothing in this subchapter, including the provisions of paragraph (1) of this subsection, shall bar a cause of action that an owner or operator or any other person subject to liability under this section, or a guarantor, has or would have, by reason of subrogation or otherwise against any person.

42 U.S.C. § 9607(e). The court reiterated that "even if an estate could otherwise escape liability by the trustee's abandonment of property such abandonment would not be effective under CERCLA." 45 B.R. 285. The court concluded that "the cost incurred by the EPA in discharging this liability is an actual and necessary cost of preserving the estate entitled to administrative expense priority." *Id.* at 286.

Although Juniper relies on *Long Chemical,* it is interesting to note that the EPA in the *Long Chemical* case and Juniper in the instant case appear to be in a more analogous position with respect to a tank containing sulfur monochloride than with re-spect to the drums buried on the Long site. The EPA did not claim it was entitled to an administrative expense priority with respect to the cleanup of the tank because the tank had been sold by the trustee at the auction sale and was no longer property of the estate. Similarly, the property at issue here was sold by Hemingway and was not part of the estate when response costs were incurred. As part of its findings of fact, the court in *Long Chemical* noted:

The E.P.A. has admitted that the costs attributed to the cleanup of the sulfur monochloride are not allowable as an administrative expense because at the time of the release, the tank was not property of the estate and because the cleanup of the soil immediately adjacent to the tank involved real property which never was property of the estate.

45 B.R. at 281 (footnote omitted). The EPA did seek reimbursement for these expenses as a general unsecured creditor, however.

The case relied upon by Juniper, *In re Wall Tube and Metal Products Co.,* 56 B.R. 918 (Bankr.E.D.Tenn.1986), involved a claim by the State of Tennessee on behalf of the Tennessee Department of Health and Environment for postpetition expenses in connection with investigation and identification of tanks containing hazardous wastes. The trustee had given notice of an intent to convey certain items of property according to an agreement in which the buyer, who was the Debtor's former lessor, had agreed to purchase certain fixtures as well as to assume responsibility for the removal and cleanup of the tanks containing hazardous chemicals.

Although the state argued that the trustee's conveyance of the property to the lessor pursuant to the agreement may not operate as an impermissible abandonment of property of the estate for the purpose of avoiding the estate's liability for environmental cleanup costs under CERCLA, the court declared that the cases relied upon by the state in support of its argument, *City of New York v. Quanta Resources Corp.,* 739 F.2d 912 (3rd Cir.1984), *aff'd sub nom. Midlantic National Bank v. New Jersey*

*Department of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) and *In re T.P. Long Chemical, Inc.,* 45 B.R. 278 (Bankr.N.D. Ohio 1985), were distinguishable. The court stated:

> In *Long Chemical* the property in question was property of the estate at the time the response expenses were incurred. By definition, in order to be entitled to administrative priority, expenses must be "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A) (West 1979). This Court has already concluded that public policy does not prohibit the conveyance of the property out of the estate pursuant to the July 1984 agreement. Clearly, once the property is no longer property of the estate, any expenses thereafter incurred in connection with the property cannot qualify as administrative costs of preserving the estate. "Fiduciaries are not at liberty to 'preserve' the property in which their cestui have no interest."

*In re Wall Tube and Metal Products Co.,* 56 B.R. at 923. Significantly, the court in *Wall Tube* did not disagree with the court in *Long Chemical* with respect to the transfer of CERCLA liability, emphasizing that "[t]o any extent that the estate had already incurred liability or the potential for liability under the applicable statutory provisions, that liability could in no way be transferred or eliminated by the simple act of conveying the property out of the estate." 56 B.R. at 923. However, the *Wall Tube* court concluded that the conveyance at issue in the case before it "was essentially a sale to a presumably solvent entity who, by assuming ownership of the property, obviously also incurred the potential for liability for any CERCLA response costs thereafter incurred in connection with the property." *Id.* (footnote omitted).

The court's conclusion that public policy was not violated by a conveyance to a solvent entity was predicated on the Supreme Court's observation in *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1984) that:

> If the site at issue were Kovacs' property, the trustee would shortly determine whether it was of value to the estate. If the property was worth more than the costs of bringing it into compliance with state law, the trustee would undoubtedly sell it for its net value, and the buyer would clean up the property, in which event whatever obligation Kovacs might have had to clean up the property would have been satisfied. If the property were worth less than the cost of cleanup, the trustee would likely abandon it to its prior owner, who would have to comply with the state environmental law to the extent of his or its ability.

469 U.S. at 284–85 n. 12, 105 S.Ct. at 711 n. 12. Since the buyer in *Wall Tube* was aware of the presence of toxic waste on the property and agreed to assume responsibility for cleanup costs, it is obvious that the parties had made some type of assessment of the value of the property to the estate.

From the foregoing analysis of the two cases relied upon by the Trustee and Juniper, it is clear that both are factually distinguishable from the instant case in key respects. Specifically, both *Long Chemical* and *Wall Tube* involved applications for allowances of costs incurred by governmental agencies as opposed to an adversary proceeding pursuant to 11 U.S.C. § 9607(a) of CERCLA. Additionally, in the *Long Chemical* case, the release of sulfur monochloride occurred *after* the property was transferred out of the bankruptcy estate. In the instant case, the facts indicate that the drums were releasing hazardous chemicals or at least threatened to release them into the environment prior to the transfer of the property to Juniper. Moreover, the DEQE had ordered the removal of the drums before the transfer of the property, indicating that Hemingway had at a minimum already incurred the potential for liability.

With respect to the *Wall Tube* case, it is clear that the buyer was well aware that there was a hazardous waste problem when it purchased assets of the estate and agreed to assume responsibility for the removal and cleanup of the waste. In the instant case, none of the interested parties,

including the Trustee, Juniper and the two courts that approved the sale, were apprised of the presence of hazardous wastes on the property, despite the DEQE action.

In view of the unique factual situation confronting the Court and the absence of a clear precedent in the cases cited by the parties, the Court is compelled to examine other cases addressing the question of whether environmental clean up costs are administrative expenses. The Court of Appeals for the Third Circuit, in *Southern Railway Company v. Johnson Bronze Company*, 758 F.2d 137 (3d Cir.1985), considered a contractual indemnification claim of Southern Railway Company. Southern Railway had given the debtor Johnson Bronze Company a prepetition license to dispose of sewage in a drainage ditch on its right-of-way. After the South Carolina Department of Health and Environmental Control ("SCDHEC") had commenced an administrative enforcement action against it, Southern Railway asserted that its claim should be treated differently than the claims of general unsecured creditors. The court, in declining to afford priority to Southern's claim, stated:

> [T]he only basis which it [Southern] suggests for such preferential treatment is that because SCDHEC has sought to force it to clean up the drainage ditch it should be subrogated to the rights, against Johnson, of SCDHEC. Assuming without deciding that there is some legal basis for the recognition of such a subrogation right, it can rise no higher than that of SCDHEC. In *Ohio v. Kovacs* ... the Supreme Court held that Ohio's injunction directing the cleanup of a hazardous waste site was no more than a general unsecured claim. In this case, South Carolina's administrative order had not even been reduced to judgment. Thus, the claim to which Southern seeks to be subrogated, a general unsecured claim, in no way improves its priority.

758 F.2d at 141. Although the court suggested that the Supreme Court spoke definitively on the priority question in *Ohio v. Kovacs,* the court appears to overlook the fact that the Supreme Court emphasized that it did not decide "what the legal conse-

quence would have been had Kovacs taken bankruptcy before a receiver had been appointed and a trustee had been designated with the usual duties of a bankruptcy trustee." *Kovacs,* 469 U.S. at 284, 105 S.Ct. at 711. Accordingly, this Court concludes that the Supreme Court in *Kovacs* did not in fact definitively decide the priority question with respect to postpetition cleanup orders and, therefore, the Third's Circuit's opinion in *Southern Railway Company v. Johnson Bronze Company* is not dispositive of the count I issue.

The United States District Court for the District of Maine, in *In re Stevens,* 68 B.R. 774 (D.Maine 1987), a Chapter 7 case, recently decided the issue of whether the cost of a postpetition cleanup of a prepetition environmental hazard by the State of Maine Department of Environmental Protection ("DEP") constitutes a first priority administrative expense or an unsecured claim. Its conclusion differed from that of the Third Circuit. The court found that the Supreme Court's decision in *Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) altered the criteria for determining administrative expenses. Accordingly, the court concluded that since the trustee, who was obligated to comply with valid Maine law regulating the disposal of hazardous waste, failed to arrange for its removal and disposal the estate was liable for the costs the DEP incurred in removing the waste as an administrative expense. 68 B.R. at 783.

Assuming, as did the Third Circuit in *Southern Railway Company v. Johnson Bronze Company,* 758 F.2d at 141, that Juniper may have some right of subrogation to the EPA or the DEQE, then Juniper's response costs easily could be classified as an administrative expense pursuant to *In re Stevens,* 68 B.R. 774 (D.Maine 1987), if the costs were incurred with respect to property of the estate.

In a recent bankruptcy court opinion, *In re Pierce Coal and Construction, Inc.,* 65 B.R. 521 (Bankr.N.D.W.Va.1986), the court noted:

Congress specifically categorized prepetition expenses into priorities in 11 U.S.C. § 507. The 1984 amendments expanded the list of priorities, but no category was created for environmental damages and this Court is not empowered with the authority to change the priorities enacted by Congress.

65 B.R. at 530. However, the court, after careful review of the developing body of case law and 11 U.S.C. §§ 507 and 503(b)(1)(A), concluded that an insurance company's claim as a subrogee of the State of West Virginia for the cost of reclaiming areas disturbed by the debtor in possession, who was engaged in surface coal mining, was entitled to administrative expense priority. *Id.*

In *In re Dant & Russell, Inc.*, 61 B.R. 668 (Bankr.D.Or.1985), *aff'd*, 67 B.R. 360 (D.Or.1986), the court, following *Southern Railway Co. v. Johnson Bronze Co.*, 758 F.2d 137 (3d Cir.1985), held that a lessor was not entitled to administrative priority for the cost of removing toxic waste deposited prior to the filing of the Chapter 11 by the debtor, who occupied the lessor's property under both an unauthorized postpetition lease and an earlier lease in existence at the time of filing. Unlike the situation in the instant case, the court was able to determine that the debtor's liability for damages to the lessor arose prior to the filing of the Chapter 11. However, the district court opinion clearly reveals that the toxic waste problem was identified by the state environmental authorities postpetition and the lessor incurred response costs to mitigate hazards under an agreement with the EPA postpetition as well.

In the District of Massachusetts, the court per Judge Lavien addressed the issue of whether the State of New Jersey, as the holder of "a contingent administrative or, possibly secured claim" should be classified as an impaired class for purposes of confirmation of a plan of reorganization. *In re Distrigas Corp.*, 66 B.R. 382 (Bankr.D. Mass.1986). Although New Jersey had entered into an administrative consent order

with respect to a complete resolution of the toxic waste problem, New Jersey had neither commenced formal action to compel the debtor to clean up toxic waste nor expended any money to resolve the problem. At the time of filing, the State had merely sent a letter to the debtor in an effort to enforce its clean up powers. *Id.* at 385. The court ruled that New Jersey could not be impaired under a plan and was entitled to administrative claim treatment instead. Like the situation in *In re Dant & Russell, Inc.*, 61 B.R. 668 (Bankr.D.Or. 1985), toxic waste problems in *Distrigas* stemmed from the activities of either the debtor or its predecessors in interest prior to the Chapter 11. Unlike the Oregon court, the court in *Distrigas* relied on the Supreme Court's decision in *Midlantic National Bank*, stating: "[t]o the extent it would seek reimbursement, it would under the Supreme Court's *Midland [sic] National Bank v. New Jersey, supra,* decision obtain a first priority administrative claim." 66 B.R. at 386.

The preceding review of recent cases involving the classification of clean up costs reveals that the peculiar facts of each case more often than not determine the outcome. Moreover, it would appear that some cases may be rightly decided for the wrong reasons.

█ In the instant case Juniper's cause of action under CERCLA arose when the property containing the drums was transferred to Juniper or, alternatively, when Juniper expended money in response to the EPA's administrative order. Accordingly, any liability for damages under CERCLA arose postpetition, although the toxic wastes presumably were dumped on the Woburn property prepetition. *Cf. United States v. Price*, 577 F.Supp. 1103, 1110 (D.N.J.1983) ("It appears with respect to § 107, that the government must first begin the cost of cleanup and incur some expenses before it can initiate an action."); *State ex rel. Brown v. Georgeoff*, 562 F.Supp. 1300, 1315 (N.D.Ohio 1983).[4]

4. The Court notes that the question of when a cause of action accrues under CERCLA has led

two judges of the Southern District of New York to withdraw the reference from the bankruptcy

Accordingly, Juniper's claim under CERCLA is distinguishable from the prepetition claim analyzed in *Southern Railway Co. v. Johnson Bronze Co.*, 758 F.2d 137 (3d Cir.1985), and the claim analyzed in *In re Dant & Russell, Inc.*, 61 B.R. 668 (Bankr.D.Or.1985), which was not predicated on CERCLA. Moreover, unlike all of the other cases just discussed, except *Dant & Russell*, and *Southern Railway* the instant case does not involve a claim by a governmental unit. Therefore, while the cases discussed are helpful in resolving the dispute between Juniper and the Trustee they are not determinative.

Essentially, Juniper, in count I, has alleged that under CERCLA the trustee is strictly liable to it for its past and future response costs. Accordingly, the determination of whether Juniper's claim for damages is an administrative expense is governed, not so much by the Supreme Court decisions in *Midlantic National Bank* and *Kovacs* but by the Supreme Court's decision in *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). In that case, which involved an interpretation of § 64(a) of the Bankruptcy Act,[5] which is substantially similar to 11 U.S.C. §§ 503(b) and 507(a), the Supreme Court held that damages resulting from the negligence of a receiver acting within the scope of his authority gave rise to actual and necessary costs of operating the debtor's business under a Chapter XI arrangement and, therefore, were entitled to priority status as costs of administration. The Supreme Court noted the arguments of the trustee, including 1) that first priority status for negligence claims would not encourage third parties to deal with insolvent businesses; 2) such status would reduce the amount of funds available for unsecured creditors; and 3) such status would

discourage general creditors from accepting arrangements. Although the Supreme Court did not reject the relevant statutory objectives cited by the trustee—rehabilitation of insolvent businesses and preservation of assets for distribution among general creditors should the arrangement fail—it emphasized a single point: "the trustee has overlooked one important, and here decisive statutory objective: fairness to all persons having claims against an insolvent." 391 U.S. at 477, 88 S.Ct. at 1763. Noting that the victims of the receiver's negligence did not merely suffer injury at the hands of an insolvent business but had an insolvent business thrust upon them by operation of law, the Supreme Court concluded that:

> it would be inconsistent both with the principle of *respondeat superior* and with the rule of fairness in bankruptcy to seek these objectives at the cost of excluding tort creditors of the arrangement from its assets, or totally subordinating the claims of those on whom the arrangement is imposed to the claims of those for whose benefit it is instituted.

471 U.S. at 479, 88 S.Ct. at 1764.

In the case of *In re Charlesbank Laundry, Inc.*, 755 F.2d 200 (1st Cir.1985), the Court of Appeals for the First Circuit relied on *Reading Co. v. Brown* and held that a civil compensatory fine for the debtor's violation of an injunction qualified for first priority treatment as an actual and necessary administrative expense of preserving the estate, even though the injunction arose from proceedings involving allegations of nuisance rather than negligence. After the debtor filed its Chapter 11 case, the plaintiff sought that portion of the fine representing postfiling legal expenses. Although the bankruptcy judge and the district court judge denied the claim as an

---

court of that district. *In re Combustion Equipment Associates, Inc.*, 67 B.R. 709 (S.D.N.Y. 1986); *United States v. Johns-Manville Corp.*, 63 B.R. 600 (S.D.N.Y.1986); see 28 U.S.C. § 159(d). In the instant case, the Debtor may well have incurred the potential for liability prepetition. However, with respect to its liability to Juniper pursuant to § 107(a)(2)(B) of CERCLA, the Debtor incurred that liability postpetition.

**5.** Section 64(a) provides in part as follows:

> The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankruptcy estates, and the order of payment, shall be (1) the costs and expenses of administration, including the actual and necessary costs and expenses of preserving the estate subsequent to the filing of the petition....

administrative expense, the Court of Appeals for the First Circuit stated: "If fairness dictates that a tort claim based on negligence should be ahead of pre-organization claims, then, *a fortiori*, an intentional act which violates the law and damages others should be so treated." *In re Charlesbank Laundry, Inc.*, 755 F.2d at 203.

In the Court's view, the rationales of the *Reading Co. v. Brown* and *In re Charlesbank Laundry, Inc.* cases compel a ruling that the response costs incurred by Juniper are entitled to treatment as administrative expenses. Indeed, the factual circumstances of the instant case are more analogous to those two cases than the bankruptcy cases cited by the parties and the other cases just discussed. Clearly, if damages leading to a negligence claim against a receiver qualify as administrative expenses then so do damages giving rise to a strict liability claim against a Chapter 11 debtor-in-possession under CERCLA. Accordingly, the Court holds Juniper is entitled to its response costs as Chapter 11 administrative expenses.

Not only is the Court moved by the concept of fairness emphasized by the Supreme Court and the First Circuit Court of Appeals, it is moved by its awareness that both the court in *Long Chemical*, and the court in *Wall Tube* frowned on the notion of a debtor attempting to transfer its liability or potential for liability under state or federal environmental laws. Since in this case, it is undisputed that the Debtor was given some type of notice by the DEQE of the barrels containing toxic chemicals on its property, it is likely that the Debtor incurred at least the potential for liability under Massachusetts or federal environmental laws. Thus, the Court's decision not only comports with the rationale of the Supreme Court's decision in *Brown* but also with the concerns expressed by the bankruptcy courts in the two cases cited by the parties.

## II

As the Trustee correctly recognizes, the basis of Juniper's cause of action set forth in count II of its complaint is far from clear. The Trustee debunks two possible theories upon which count II may be predicated: 1) that the Olympia Avenue property was encumbered by the Massachusetts "Superlien," *see* Mass.Gen.Laws ch. 21E, § 13; and 2) that the debtor-in-possession breached warranties with respect to the May 18, 1983 conveyance.

■ Juniper maintains that the Olympia Avenue property is encumbered by a statutory lien pursuant to Mass.Gen.Laws ch. 21E, § 13 because it was conveyed after the Debtor was notified by the DEQE of the presence of twelve barrels containing hazardous waste on the property. Section 13 provides in relevant part:

Any liability to the commonwealth under this chapter shall constitute a debt to the commonwealth. Any such debt, together with interest thereon at the rate of twelve per cent per annum from the date such debt becomes due, shall constitute a lien on all property owned by persons liable under this chapter *when a statement of claim naming such persons is recorded or filed.* If the site described in such statement comprises real property, the statement shall be recorded in each registry of deeds in the commonwealth; and shall also be registered in each registry district in which any person named in such statement of claim holds record title to registered land as shown on the current index of registered land owners in such district. The land court certificate number of each such owner shall be noted on the statement when presented for recording and each assistant recorder, upon receipt of such statement, shall note such statement on the owner's certificate of title . . .

Mass.Gen.Laws Ann. ch. 21E, § 13 (West 1981 & Supp.1987) (emphasis supplied). Juniper suggests that the Trustee misconstrues the statute and its effect on the litigation by arguing that no lien or liability notice was ever recorded to encumber the property. However, Juniper cites neither the legislative history nor case law for the proposition that a lien is created absent the

requisite filings. While the Court is sympathetic to Juniper's position, the Court considers Juniper to be the party misconstruing section 13 of chapter 21E. The language of section 13 is unambiguous. It requires the recording or filing of a statement of claim for a debt to the Commonwealth to constitute a lien on the property. In the absence of any authority for a contrary interpretation of the plain language of the statute, this Court will not endeavor to create a lien in Juniper's favor.

■ With respect to the breach of warranty theory addressed at length by the Trustee in its briefs in support of its motion for summary judgment, the Court notes that Juniper has failed to respond to the Trustee's compelling arguments either in its brief in opposition to the Trustee's motion for summary judgment or by way of a reply brief to the Trustee's supplemental brief. Accordingly, the Court will not consider this aspect of count II in depth. Nevertheless, the Court is struck by the specific, separately typed language in the standard form purchase and sale agreement executed between the Debtor and Juniper to the effect that:

> Buyer further warrants and represents to Seller that Buyer has made all such inspections of the premises as Buyer wishes to make. It's a condition to Buyer's obligation to purchase that the Premises may be used as a freight transfer station and warehouse. Prior to the delivery of the deed, Buyer will satisfy himself that such is the case and whether the Premises comply with the Building, Zoning and Wetlands Protection laws.

In view of this disclaimer, the Court would be hard pressed to find in favor of Juniper even if Juniper were to pursue count II on a breach of warranty theory apart from Mass.Gen.Laws ch. 21E, § 13. Accordingly, the Court grants summary judgment in favor on the Trustee on count II. However, this ruling does not implicate Juniper's CERCLA claim. *See Mardan Corp. v. C.G.C. Music, Ltd.,* 600 F.Supp. 1049 (D.Ariz.1984), *aff'd,* 804 F.2d 1454 (9th Cir. 1986).[6]

### III

Like count II of Juniper's complaint, count III lacks specificity.[7] The Court has characterized the count as one for equitable rescission. Juniper suggests that it is entitled to a rescission of the March, 1983 conveyance because of fraud and because of a violation of Mass.Gen.Laws ch. 21C, § 7.

■ To the extent that count III (or for that matter count II) rests on fraud, the Court finds that Juniper has failed to plead fraud with the specificity required by Fed. R.Civ.P. 9(b) which is made applicable to this adversary proceeding by Bankruptcy Rule 7009. In particular, Juniper has no where alleged that it relied on materially false representations made by the Debtor. Moreover, in its memorandum, it has failed to rebut the Trustee's argument that the general rule in Massachusetts with respect to mere nondisclosure should be applied. That rule provides that mere nondisclosure is not actionable absent affirmative steps by the Debtor to conceal defects or to prevent the plaintiff from acquiring knowledge of the defects. *See Swinton v. Whitinsville Savings Bank,* 311 Mass. 677, 42 N.E.2d 808 (1942). Although Juniper suggests that count III of its complaint is sufficient because its Motion for Stay of Bankruptcy, a pleading filed in the main case and not the instant adversary, gives notice of the fraud claim and further that the allegations in its complaint give notice

---

**6.** The court in *Mardan Corp.* noted that:

[T]he warranty disclaimer is effective to preclude only causes of action which are based on breach of warranty theory. Mardan's lawsuit is based not upon warranty theory but rather upon the statutory cause of action created by section 107(a) of CERCLA. Therefore, [the warranty disclaimer of the purchase agreement] does not defeat plaintiff's recovery.

600 F.Supp. at 1055.

**7.** Count III provides in relevant part:

Said Conveyance was fraudulent and voidable and entitles the Plaintiff to a recission of the sale, return of the purchase price, reimbursement for all transportation costs, and reimbursement for the present fair market value of the property had no hazardous waste existed.

of the act which is the basis of the claim, the Court notes that the element of reliance is absent from all its pleadings and is a particularly serious defect in view of the warranty disclaimer and the affidavits submitted by the Trustee that indicate hazardous waste issues were never raised by Juniper.

■ In its brief, Juniper also suggests that rescission is an appropriate remedy because the property was fraudulently conveyed in violation of Mass.Gen.Laws ch. 21C, § 7. That section provides in relevant part:

> Section 7. Licenses for collection, transportation, treatment, etc., of hazardous waste; underground drinking water source
>
> *     *     *     *     *     *
>
> The department may issue a license subject to such terms, restrictions, conditions and requirements as it determines to be necessary to comply with the provisions of this chapter. No facilities shall be constructed, maintained or operated except pursuant to the terms, restrictions, conditions and requirements established by the department in a license duly issued hereunder and pursuant to the terms of an assignment of a site for said facilities if said assignment is required pursuant to the provisions of section one hundred and fifty A of chapter one hundred and eleven. No storage, treatment, use or disposal for which a license is required pursuant to this chapter, and no construction, maintenance, or operation of a facility for which such license is required, shall proceed until notice that such license has been recorded in the registry of deeds, or if the land affected thereby be registered land, in the registry section of the land court for the district wherein the land lies. *No land on or in which hazardous waste has been disposed, and no interest in such land, shall be conveyed or leased, and no such land shall be devoted to any use other than as a facility for such disposal, until notice of such disposal is recorded in the registry of deeds, or if the land affected thereby be registered land, in the registry section of the land court for the district wherein the land lies.*

Mass.Gen.Laws ch. 21C, § 7 (West 1981 & Supp. 1987) (emphasis supplied). Juniper relies exclusively on the underlined portion of section 7 in conjunction with Mass.Gen. Laws ch. 21E, § 13 for its contention that the Debtor fraudulently conveyed the Olympia Avenue property. The Trustee, however, urges the Court to examine both the broader context of section 7, a section that concerns the issuance of licenses to commercial operations engaged in collecting and disposing of hazardous waste, and the definition of a facility, Mass.Gen.Laws ch. 21E, § 2. Section 2 defines a facility as "a site or works for the storage, treatment, dewatering, refining, incinerating, reclamation, stabilization, solidification, disposal or other processes where hazardous wastes can be stored, treated or disposed of...." *Id.* It precludes the creation of a facility by spills or unauthorized abandonment. The Trustee maintains that nothing in chapter 21C or its legislative history suggests that the chapter was intended to impose a statutory duty on all sellers of real estate to conduct investigations for the purpose of discovering hazardous wastes. The Trustee adds that no case law exists permitting the sale of real estate to be voided pursuant to chapter 21C. In the complete absence of authority for Juniper's position, the Court agrees with the position advanced by the Trustee. Furthermore, because the Court has determined that Juniper has an adequate remedy at law under CERCLA, Juniper is not prejudiced by the entry of summary judgment in favor of the Trustee with respect to its claim for equitable rescission. *Commonwealth of Massachusetts v. Pace*, 616 F.Supp. 815, 822 (D. Mass. 1985).

### IV

In view of the foregoing, the Court hereby orders:

1) that Juniper amend count I to include the statutory prerequisite of 42 U.S.C. § 9607(a)(2)(B) within 10 days of the date

of this order if it wishes to pursue its cause of action and;

2) that a further hearing be scheduled for the purpose of establishing the exact amount of Juniper's response costs and estimating its future costs pursuant to 11 U.S.C. § 502(c).

3) that summary judgment enter in favor of the Trustee and against Juniper with respect to counts II and III of Juniper's complaint.