**In re George Granger MacDONALD, Debtor.**

**Bankruptcy No. 88–54028–C.**

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

May 31, 1991.

Barry P. Broughton, Broughton & Kyser, P.C., Austin, Tex., for debtor.

Bruce H. Beck, Russell & Hoffman, Inc., San Antonio, Tex., for creditors.

## DECISION AND ORDER ON ESTIMATION OF POST–PETITION ADMINISTRATIVE CLAIM

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the application of William C. Cole, Richard L. Jones, Mark D. Volrath, Arthur N. Bruner, Jack W. Tautkus, Ronald L. Benters, and Larry M. Waldrop for payment of post-petition adminis-

trative tort claim. The court determined that it would not be possible to determine final allowance of the claim prior to the hearing on confirmation of the debtor's plan, scheduled two weeks thereafter. The court scheduled a hearing two days later for the limited purpose of claims estimation pursuant to 11 U.S.C. § 502(c), deferring formal adjudication to another day. This decision and order arises out of that claims estimation hearing.

## JURISDICTION

This court has original jurisdiction over this matter by virtue of 28 U.S.C. §§ 1334(a), (b), and 157(b)(2), and 11 U.S.C. § 502(c).

## BACKGROUND FACTS AND PROCEDURAL POSTURE OF THE CASE

William C. Cole, et al. claim that G. Granger MacDonald participated in a scheme to defraud them, both individually and in collusion with an entity known as S.K.C.I., Inc., and certain other individuals.[1] According to the claimants, MacDonald, S.K. C.I., and these individuals agreed that they could obtain loans for H.U.D. projects in excess of 100% of appraised value, meaning they could pass on the excess loan proceeds to investors, with repayment at the favorable loan terms associated with the H.U.D. projects. In their agreement, S.K.C.I. would find the financing while MacDonald would find the likely projects. MacDonald would get brokerage fees and his company, FBN, would earn additional fees for due diligence work.

Continue the claimants, S.K.C.I. and MacDonald decided to look for investors. S.K.C.I. evidently found the claimants, convincing them to invest over $392,000. Claimants maintain that S.K.C.I. was acting both individually and as agent for MacDonald. The approach is alleged to have taken place in July 1989—*after* MacDonald was in bankruptcy. MacDonald and his

company are supposed to have used some of these funds to pay for completing due diligence on some projects.

Then, the H.U.D. scandals hit the national press and the prospects for the investment scheme evaporated overnight. S.K. C.I. ceased further communication with all parties. According to the claimants, MacDonald convinced Cole, et al. that he would find alternative sources of funding, as well as subsequent purchasers for projects to whom to "flip" the properties. Claimants maintain that MacDonald represented he had a buyer for a property in Las Colinas (a development near Dallas/Fort Worth International Airport), that a certain $35,000 letter of credit put up would be refunded, and that another $15,000 would be needed for further due diligence. They also charge that MacDonald obtained the unauthorized release of $50,000, converting partnership funds, and that he used investor funds to pay a legal bill for which only MacDonald was liable. Finally, claimants contend that MacDonald never told them that, during the entire time, MacDonald was (and still is) in bankruptcy, something they did not learn until after MacDonald and his company, FBN, sued them to recover fees alleged owed and unpaid by the investors and they took his deposition in the litigation.

The claimants counterclaimed for fraud, violations of the RICO statute, violations of the securities laws, and real estate fraud. There has been extensive discovery in the case, with MacDonald's deposition having been taken and over 6000 documents having been produced. While discovery is not yet complete, the claimants acknowledge that they have the majority of their case assembled.

At the hearing on estimation of this claim, claimants offered no affidavits, depositions, or exhibits (other than the litigation pleadings), and no testimony other than the expert testimony of the attorney for the claimants, who stated that the plaintiff had

---

1. For our purposes, we will not refer further to the individuals, who are alleged (for purposes of this hearing) to have acted in concert with S.K. C.I. Obviously, there is much more to this case than this brief summary could hope to explain, but further detail is not necessary, in light of the ultimate disposition of this motion.

made a settlement offer of $125,000 to S.K.C.I. He added that he believed that number fairly represented the value of the litigation against MacDonald as well, adding that the claimants would be happy to walk away with that amount from *either* S.K.C.I. *or* MacDonald. He also acknowledged, upon examination by opposing counsel, that both liability and damages are hotly contested by MacDonald, and that no settlement offer had to date been made to MacDonald. A proposal *had* been made that, as between FBN and the claimants, the parties would both walk away from their respective claims, but MacDonald was not a party to that proposal. Counsel for the claimants maintains that the facts presented state a strong RICO action, but that the facts are weak with respect to who is responsible for the wrongful conduct.

Counsel for the debtor also put on no evidence, and maintained in closing that the claimants had failed to support their claims estimation with any competent evidence to enable the court to estimate the claim. They urged the court to value the claim, for plan purposes, at zero. Counsel for the claimants, while not urging a specific amount on the court, repeated the $125,000 amount proposed in its settlement with S.K.C.I.

## ANALYSIS

■ The broad definition of claim in Section 101(4) includes of necessity post-petition obligations incurred by the trustee or debtor-in-possession. 11 U.S.C. § 101(4); *see Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968); *In re Charlesbank Laundry, Inc.*, 755 F.2d 200, 202 (1st Cir.1985). Section 1141(d) in turn says that plan confirmation discharges "the debtor from any debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A); *see Matter of Baldwin–United Corp.*, 55 B.R. 885, 898 (Bankr.S.D. Ohio 1985) ("the combined effect of § 101(4) and § 502(c) is to bring all claims of whatever nature into the bankruptcy estate, and to give all claimants the same

opportunity to share in any distribution from the estate").

Section 503(a) authorizes *any entity* to file a request for payment of an "administrative expense." 11 U.S.C. § 503(a). The plain language of Section 503 also emphasizes that any entity with an administrative claim that wants to share in the estate has to request payment, or risk being discharged without further recourse. Subsection (b) sets up the process for allowance of such "requests" ("[a]fter notice and a hearing, there shall be allowed administrative expenses … *including—*"). *See* 11 U.S.C. § 503(b); *see also* 124 Cong Rec H11094–95 (daily ed. September 28, 1978) (remarks of Rep. Edwards). The term "including" in Section 503(b) indicates that administrative expenses are not limited to those listed in the statute, while case law confirms that "damages for a post-petition tort become an administrative expense under 11 U.S.C. § 503(b)(1)(A)." *In re Dennis Ponte, Inc.*, 61 B.R. 296, 299 (Bankr. 9th Cir.1986), *citing Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968); *In re Charlesbank Laundry, Inc.*, 755 F.2d 200, 202 (1st Cir.1985); *In re Chicago Pacific Corp.*, 773 F. 2d 909, 913–14 (7th Cir.1985); *In re Hemingway Transport, Inc.*, 73 B.R. 494, 503–04 (Bankr.D.Mass.1987) (CERCLA liability); *In re Pettibone Corp.*, 90 B.R. 918, 934 (Bankr.N.D.Ill.1988) (defective product liability); *see In re Dant & Russell, Inc.*, 853 F.2d 700, 707 (9th Cir.1988) (lease expenses).

■ The estimation of an unliquidated or contingent administrative claim such as the post-petition tort claim is essential prior to the hearing on confirmation of a plan, in order for the court to evaluate the feasibility of the plan without unduly delaying the confirmation process. *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985); *In re Dennis Ponte, Inc.*, 61 B.R. 296, 299 (Bankr. 9th Cir.1986). This is so because any finding of feasibility that failed to take into account the possibility of the allowance of administrative claim that would have to paid in full would be clearly erroneous. *Pizza of Hawaii*, 761 F.2d at

1382; *see* 11 U.S.C. § 1129(a)(9)(A); [2] *see also* 11 U.S.C. § 1129(a)(11) ("[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor ..."). A court must therefore have some idea of the *allowed* amount of the "claim of a kind specified in Section 507(a)(1)." [3] By the same token, the same reasons that justify estimation of pre-petition claims for plan purposes (avoiding delay in the confirmation of process) also warrant estimation of post-petition administrative expense for plan purposes.

■ Section 502(c) immediately commends itself as the appropriate vehicle for estimating post-petition claims such as the one here under discussion. However, the section facially applies only to *pre-petition* claims.[4] Post-petition claims and their allowance are governed by Section 503. *See* 11 U.S.C. § 503(a), (b), and discussion *supra*. Courts have nonetheless assumed that the estimation process in Section 502(c) may be equally employed for estimating post-petition claims, when necessary to avoid delaying the administration of the bankruptcy case (especially when it comes to the confirmation process). *Dennis Ponte, supra; Pizza of Hawaii, supra; see Bittner v. Borne Chemical Co.,* 691

F.2d 134, 137 n. 9 (3rd Cir.1982); *see also Matter of U.S. Truck Co., Inc.,* 42 B.R. 790, 793 (Bankr.E.D.Mich.1984).

Given that the Bankruptcy Rules offer no guidance on how even the *allowance* of administrative expense claims are to be handled,[5] much less their estimation for plan purposes, courts must fashion their own procedures, under the general authority conferred by Rule 16 of the Federal Rules of Procedure (made applicable to contested matters in bankruptcy by Bankruptcy Rules 7016 and 9014). This court concurs with the foregoing authorities that the Section 502(c) estimation process may be adapted to the handling of contingent or unliquidated administrative claims when the full-blown allowance process under Section 503(b) would unduly delay the administration of the bankruptcy case, as it undoubtedly would here.[6]

■ Recognizing that flexibility must be the watchword in bankruptcy cases, the Fifth Circuit has said that, in the estimation process, "... the bankruptcy court should use whatever method is best suited to the circumstances." *Matter of Brints Cotton Marketing, Inc.,* 737 F.2d 1338, 1341 (5th Cir.1984). The court is permitted to exercise its discretion in selecting a

---

**2.** Section 1129(a)(9) provides that

> The court shall confirm a plan *only if all of the following requirements* are met:
>
> .    .    .    .    .
>
> (9) ... the plan provides that—
> (A) with respect to a claim of a kind specified in Section 507(a)(1) ..., on the effective date of the plan, the holder of such claim will receive on account of such claim *cash* equal to *the allowed amount* of such claim;

11 U.S.C. § 1129(a)(9)(A).

**3.** Section 507(a)(1) says that—

> The following expense *and claims* have priority in the following order:
> (1) First, administrative expenses allowed under Section 503(b) of this title ...

11 U.S.C. § 507(a)(1). Any request for payment of an administrative claim filed under Section 503(a), if allowed under Section 503(b) (even if not listed in one of the subparagraphs under subparagraph (b)), will thus have priority under Section 507(a)(1) and must be paid under a plan in accordance with Section 1129(a)(9)(A).

**4.** Section 502(c) states that

> There shall be estimated for purposes of allowance under this section—(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case
> ...

11 U.S.C. § 502(c).

**5.** The legislative history optimistically stated that "[t]he Rules of Bankruptcy Procedure will specify the time, the form, and the method of such a filing." H.Rep. No. 595, 95th Cong., 1st Sess. 355 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6311. Unfortunately, the rules do not give the guidance Congress had hoped they would. In fact, they give no guidance at all. Bankruptcy Rule 3003 is clearly drafted to implement Section 502, not Section 503. There is no implementing rule for the latter section, despite Congress' suggestion.

**6.** The parties agree that, if this claim were fully tried, it would take no less than two weeks to put on the evidence, and that the federal district court in which the lawsuit is now pending is not likely to reach the case for trial for at least two years.

method, and the estimation will be disturbed on appeal only on a showing of abuse of that discretion. *Id.; Bittner, supra; see* 3 *Collier on Bankruptcy,* ¶ 502.03 at 502–77 (15th ed. 1983) ("[i]n estimating the value of an unliquidated claim, 'the bankruptcy court is bound by the legal rules which govern the ultimate value of the claim'"). The estimation of post-petition administrative claims is especially sensitive because such claims must be paid in full and such payment is a precondition to confirmation. "Guessing wrong," as it were, can result in confirmation of plans which should never have been confirmed (where the estimate is too low) or in scuttling plans which otherwise could have worked, to the detriment of other creditors (where the court overestimates the value of the claim).[7] By the same token, the party with the strongest vested interest in an accurate estimate of such a claim is the claimant, so that party must bear primary responsibility for furnishing the court with the kind of information needed to make an accurate estimate—and must suffer the consequences if the estimate proves to be less than accurate. The burdens of both persuasion and of going forward with respect to the estimation of an administrative claim must therefore lie with the party asserting the claim.

■ At the beginning of this hearing, the parties announced their intention to employ an abbreviated procedure in lieu of a fullblown presentation of witnesses and exhibits. The court and counsel then agreed upon a set of ground rules on the spot, including authorizing the use of so-called "proffers" of evidence in lieu of formal testimony, as permitted under Rule 43(e) of the Federal Rules of Civil Proce-

dure. The court also adverted that affidavits, deposition testimony, exhibits, answers to discovery requests, and even limited live testimony would also be entertained, in a kind of "summary trial." *See* Fed.R.Civ.P., Rule 43(e), Rule 16; *see Matter of Baldwin–United Corp.,* 55 B.R. 885, 899, 911 Exhibit A (Bankr.S.D.Ohio 1985) (decision describes summary trial method for claims estimation, and attaches as an appendix copy of order setting out the procedure).

Even though the court adopted the Rule 43(e) procedure for purposes of making a record, counsel for the debtor was quite specific in insisting that the record consist of competent evidence within the confines of that rule. Thus, all parties knew from the beginning that the procedure adopted for estimating this claim would require the presentation of competent evidence that would be cognizable in a summary trial or summary judgment hearing, thereby preserving the parties' respective due process rights while still disposing of the matter without derailing the confirmation process. Mere argument and allegation would not be enough.

The claimants' evidence consisted only of (1) certain pleadings (but not for the truth of the matters therein, save insofar as there were admissions in the debtor's pleadings), (2) the "expert testimony" of counsel for the claimants, who offered his opinion as to the value of the litigation for settlement purposes, and (3) the testimony of the same lawyer in response to "cross examination" by counsel for the debtor. The claimants of course also *described* the allegations in their lawsuit extensively, via their counsel's arguments. No depositions, answers to discovery, exhibits, or other tes-

---

**7.** The underestimation of pre-petition claims will not have quite the dramatic impact on the ultimate success of a plan, because the amount of the claim ultimately allowed and in excess of the estimated amount is arguably discharged. *In re Baldwin–United Corp.,* 57 B.R. 751, 758–59 (S.D. Ohio 1985). One could argue that post-petition claims are also discharged to the extent they are not paid or handled under the plan, relying on the same authority and the operation of Section 1141(d). However, Section 502(j) permits reconsideration of any claim that has

been allowed or disallowed "for cause," and further advises that such a reconsidered claim may be allowed or disallowed "according to the equities of the case." 11 U.S.C. § 502(j). That section should apply with equal (perhaps even especial) force to administrative claims the allowed amount of which has been estimated for plan purposes, in light of the clear intent expressed in Section 1129(a)(9)(A) that such claims be paid in full as a pre-condition to confirmation.

timony were submitted, nor were affidavits.

The court is constrained to find that no competent "summary trial" evidence was presented (other than the "expert testimony" of counsel) in support of estimating the claim of the claimants in this case. Were this a pre-petition claim, the court would easily conclude that the claimants had failed to sustain their burden, and would estimate the claim at zero, denying the claimants participation in the plan process (i.e., for voting and tallying purposes). Here, however, we are trying to estimate what the allowed amount of a *post-petition* administrative claim will be, not because the claim will be voting (it will not be voting) nor because the claim will be tallied into some class to determine how the class has voted (it can only be classified and impaired if it consents to such treatment), but because we need to know whether the plan proponent will be able to satisfy the requirements for confirmation imposed by subsections (a)(9) and (a)(11) of Section 1129.

As earlier observed, if a *pre-petition* claim is estimated for plan purposes under Section 502(c), it is very likely that the balance of the claim in excess of the estimated amount is discharged by the plan. 11 U.S.C. § 1141(d)(1)(A); *Matter of Baldwin–United Corp.*, 57 B.R. 751, 758–59 (S.D.Ohio 1985). This is due in part to the precise language of Section 502(c) itself ("[t]here shall be estimated *for purpose of allowance under this section ...*"). 11 U.S.C. § 502(c); *see Matter of Baldwin–United Corp.*, 55 B.R. 885, 898 (Bankr.S.D. Ohio 1985).[8]

Equally important to recall at this point, however, is that Section 502(c) does not by its own terms apply to *post*-petition claims. *See* discussion *supra* at 165. We have merely "borrowed" the estimation proce-

dure under the more general authority conferred on this court by Bankruptcy Rules 7016 and 9014 to regulate the manner in which evidence is presented in a contested matter. *See Matter of Baldwin–United Corp.*, 55 B.R. at 899, 911 Exhibit A; *Matter of Brints Cotton Marketing, Inc.*, 737 F.2d at 1341; *Bittner v. Borne Chemical Co.*, 691 F.2d at 137 n. 9; *In re Pizza of Hawaii*, 761 F.2d at 1382; 3 *Collier on Bankruptcy*, ¶ 502.03 at 502–77 (15th ed. 1983). We are not bound to blindly apply Section 502(c) and all its legal baggage to post-petition administrative claims, *see Matter of Baldwin–United Corp., supra,* nor should we where to do so would defeat the legitimate ends of other provisions of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(9)(A) (expressing clear legislative intent that "allowed" post-petition claims be paid in full as a precondition to confirmation).

This court does not find that the *Baldwin–United* analysis dictates that the estimated amount of a *post-petition* administrative claim necessarily sets the outer limit of a claimant's right of recovery, as it apparently does for pre-petition claims.[9] Congress certainly intended that post-petition administrative claims be paid in full, and that they be paid in advance of pre-petition creditors. Were the estimation process to set the outer limits of allowance for such claims, the due process rights of such claimants would be jeopardized to a far greater degree than were the due process rights of the pre-petition claimants in *Baldwin–United*. *See Matter of Baldwin–United Corp.*, 55 B.R. at 899–901.

The better rule seems to be that estimation primarily serves to assist the court and parties in interest in evaluating the feasibility of a given plan under Section 1129(a)(11). In addition, the estimation process may fulfill the allowance requirement for purposes of Section 1129(a)(9), but will

---

**8.** Observed that court:
  When [Section 502(j) is] read together with § 502(c), it is apparent that the estimation of a claim conclusively sets the outer limits of a claimant's right to recover either from the debtor or the estate, and that estimated claims are covered by the debtor's discharge, subject only to a § 502(j) motion for reconsideration at a later time.

*Matter of Baldwin–United Corp.*, 55 B.R. at 898.

**9.** The court does not here decide whether it agrees with *Baldwin–United*'s conclusion as applied to pre-petition claims which have been estimated under Section 502(c). The issue is not before the court at this time.

not, as in *Baldwin–United,* set the "outer limits of a claimants' right to recover." Rather, the ultimate allowance of the claim will set that right. Just as we have borrowed Section 502(c) to estimate post-petition claims, nothing prevents us from also borrowing Section 502(j) and Bankruptcy Rule 3008 to permit reconsideration of the allowance or disallowance of such claims in the appropriate circumstance, effectively circumventing the discharge provisions of Section 1141(d) to reset the allowed amount of the claim, which must still be paid in full per the directive of Section 1129(a)(9). *See* 11 U.S.C. §§ 502(j), 1129(a)(9)(A); Bankr.R. 3008.[10]

For the present estimation purposes, the court is constrained to conclude that the claimants here have *some* claim, if based on nothing more than the "expert testimony" of their lawyer proffered at the hearing. There was simply not enough competent evidence presented, however, to warrant giving to these claimants the powerful veto that Section 1129(a)(9) otherwise confers on administrative claimants, though there was ample opportunity afforded the claimants to place such evidence before the court. The court will estimate the claim for plan purposes at $1.00. Should the claim ultimately be allowed at a greater amount, the claimants may seek reconsideration of this estimated allowance under Section 502(j) after the claim is ultimately adjudicated.

So ORDERED.

---

**10.** The procedure outlined here is not entirely free from risk. Suppose, for example, that a plan is confirmed and all administrative claims are paid as "allowed," whether as actually allowed or as estimated. Suppose then that, some two years later the claim is ultimately litigated and actually determined to be considerably greater than the amount originally estimated. Suppose further that the reorganized debtor has the financial ability to continue funding its plan, but not the ability to both fund the plan and pay the claim as ultimately determined. Section 502(j) permits reconsideration "for cause" (presumed under the scheme outlined in this opinion), but cautions that allowance will turn on "the equities of the case." 11 U.S.C. § 502(j). What is more, the section protects those other creditors who have already been paid (including junior creditors) from having to disgorge any payments previously received. *Id.* A claimant's failure to do a good enough job in proving up its claim at the estimation hearing could, under this scenario, mean that the claimant will not be able to collect on the claim when its true amount is ultimately determined. Had the claimant given the court enough evidence with which to more accurately estimate the claim, the plan proponent would have had to have either paid the claim at confirmation or reserved an adequate amount to pay the estimated amount of the claim pending the ultimate adjudication of the claim.