**In re ADELPHIA BUSINESS SOLUTIONS, INC., et al., Debtors.**

**No. 02–11389 (REG).**

United States Bankruptcy Court, S.D. New York.

Dec. 12, 2003.

Judy G.Z. Liu, New York, NY, for Debtors.

## BENCH DECISION ON ACC OBJECTION TO ABIZ PLAN FEASIBILITY [1]

ROBERT E. GERBER, Bankruptcy Judge.

In the jointly administered cases under chapter 11 of the code of Adelphia Business Solutions and its subsidiaries, now known as TelCove, but whom I'll refer to as ABIZ, the plan proponents—ABIZ, the Creditors' Committee and the informal committee of 12–/14 notes—move for confirmation of their joint plan. The plan, which was overwhelmingly supported by the creditors in every class—with acceptance percentages of 95% to 100% in amount, with acceptance percentages almost as high in number—is subject to only one objection of consequence, that of feasibility—or more precisely described, the requirement of Bankruptcy Code section 1129(a)(11), for a plan of this type, that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor."

The Debtor's former parent, Adelphia Communications Corporation, or ACC— which, along with its subsidiaries, is also a debtor in a separate chapter 11 case before me (which was filed as a related case)— objects to confirmation of the ABIZ plan. ACC has filed a claim for payment, partly with administrative expense priority and partly with super-priority, even over administrative expenses, of at least $71 million, and asks me to find, for purposes of the feasibility analysis, that it will likely have a claim of at least $55 million. If either of those amounts were in fact due, the ABIZ plan would not be feasible. ACC asserts these claims in the context of ongoing efforts by ABIZ to collect very substantial sums from the ACC estate, but whether or not ACC is responding in kind (and there is a possibility that overreaching by both sides has caused this controversy), its feasibility objection raises issues requiring this Court's determination.

I conducted a two-day evidentiary hearing on the feasibility issue, and in this connection I should say what I am ruling on and what I am not ruling on. On November 18, initially on about 20 days notice, ABIZ filed a motion to estimate ACC's administrative expense claim, under section 502(c) of the Code, for both feasibility and allowance purposes. I concluded that determining the allowability of a claim of that magnitude in the time frame, and with the procedures, ABIZ proposed was inconsistent with the procedural due process to which ACC would be entitled. Today, I am considering *feasibility* by the methods ABIZ proposed, but that alone. This approach is consistent with Judge Brozman's decision in *Ralph Lauren Womenswear*, 197 B.R. 771 (Bankr. S.D.N.Y.1996), where she estimated a claim for voting purposes, and said "This being but an estimation hearing, my findings of fact will not have any preclusive effect upon the ultimate disposition of Kreisler's claim. This is due to the fundamental difference between the adjudication of a claim and its temporary allowance for plan purposes." *Id.* at 775. *See also In re MacDonald,* 128 B.R. 161 (Bankr. W.D.Tex.1991) (Clark, J.) (using estimation of admin claim to determine feasibility, but not ultimate allowance).

---

1. The following is the script for a decision that I had planned to dictate into the record. I am not in a position to do that, and offer it in this form instead. It suffers from the organizational, stylistic, citation and, most significantly, polishing deficiencies of decisions that are dictated into the record. If, as is quite possible, it suffers from typographical errors or other "bugs," I apologize in advance to the parties.

I will be holding one or very possibly two separate hearings on the matter of the amount of allowance of ACC's admin expense claim, as to which findings here will not have res judicata or collateral estoppel effect.

Today I find the plan feasible, without determining the amount due and owing to ACC. I further find that in order to go effective under the plan, ABIZ will have to put $2.74 million into a reserve; this amount does not exceed the $5 million amount that I was advised ABIZ has the wherewithal to deposit, and whose payment would not render the ABIZ plan nonfeasible.

The following are the bases for my determination. Normally I like to first set forth findings of fact, and then to follow with a separate discussion of the law. Here that's not as practical. By reason of the nature of any feasibility determination, and any estimation procedure, there are limits on the ability of the Court to find facts. In large measure, the Court instead considers likely outcomes. The determination we need to make today requires a back and forth between the law and the facts, and those that I discuss hereafter should be regarded as falling within whatever category is most appropriate.

### Background

*Preliminary Matters*

ABIZ, which now is known as TelCove, and many of its subsidiaries filed their chapter 11 cases on March 27, 2002. On June 18, 2002, more subsidiaries of ABIZ filed chapter 11 petitions, and all have remained as debtors in possession since that time.

Until January 11, 2002, ACC owned approximately 78.4% of the outstanding stock of ABIZ and held approximately 96% of the total voting power in ABIZ. On January 11, 2002, ACC distributed to the hold-ers of its Class A and Class B common stock, in the form of a dividend, all of the shares of ABIZ common stock owned by ACC (the "Spin–Off"). As of ABIZ's petition date, members of the Rigas family, who also own substantial amounts of ACC stock, held between 15% and 20% of ABIZ's common stock.

On ABIZ's petition date, ABIZ and certain of its subsidiaries entered into a postpetition credit facility (the "DIP Credit Agreement") with ACC and an affiliate of the Rigas family. Pursuant to the DIP Credit Agreement, ACC and the Rigas family affiliate agreed to provide a total of $135 million in financing to ABIZ and the other Debtors that were signatories of the Agreement, with the first $67.5 million of that financing to be provided by ACC. On April 4, 2002, I approved interim financing under the DIP Credit Agreement of $27 million, all of which was to be funded by ACC. In the first half of May 2002, ACC provided ABIZ with $15 million of this interim financing, but later that month ACC defaulted in its obligation to provide additional financing. ACC never provided any further financing.

On June 10, 2002, a subsidiary of ACC, Century Communications Corporation, filed a voluntary petition for relief in this Court under the Bankruptcy Code. On June 25, 2002, ACC and its other subsidiaries filed voluntary petitions for relief in this Court under the Bankruptcy Code. The chapter 11 cases of ACC and its subsidiaries are also pending before me.

On August 22, 2003, ABIZ, the Creditors' Committee and the Secured Noteholder Committee filed ABIZ's joint plan of reorganization and related disclosure statement. A first amended plan and a first amended disclosure statement were filed subsequently. On October 22, 2003, ABIZ filed its second amended plan and second amended disclosure statement, and

I approved the second amended disclosure statement for solicitation and scheduled the confirmation hearing on the second amended plan for December 8, 2003.

On November 18, 2003, ABIZ, the Creditors' Committee and the Secured Noteholder Committee filed their joint motion to estimate ACC's anticipated administrative claims. On November 26, 2003, ACC filed on behalf of itself and its subsidiaries and affiliates, on a consolidated basis, a proof of claim for the allowance of administrative expenses against ABIZ "in an amount not less than $71 million." ABIZ lacks the means to pay these claims if they were to be allowed, but contends that the net value of these claims to ACC is so minimal that they should be estimated at zero, or alternatively at no more than $1 million.

*The Parties' Efforts to Separate ABIZ and ACC*

For a number of reasons, prior to the Spin–Off ACC and ABIZ were managed very closely together, resulting in significant confusion as to the ownership of various assets, contracts and obligations of the two companies. To further complicate matters, some employees who had the authority to enter into contractual commitments for one or the other company entered into contracts for the benefit of both companies. Therefore, numerous contracts and assets were shared among various ABIZ and ACC entities. And historically, the ABIZ Debtors' receipts were deposited into a cash management system (the "CMS") that was under the exclusive control of ACC, with all disbursements being made from a linked disbursement account that also was in ACC's exclusive control. It was through the use of cost center information embedded in the purchase order, payroll and other financial data that the financial system distinguished between the various entities.

Though I do not need for the purposes of this motion to make a finding as to any reasons, it is plain that when the Spin–Off was accomplished, ACC and ABIZ failed to provide each other with the contractual arrangements necessary to facilitate the separation and untangling of the various assets, interests, liabilities and contractual rights and obligations of ACC and ABIZ. Similarly, ACC failed to provide ABIZ with clearly delineated access to many of the assets that ABIZ historically had needed to conduct its businesses. This condition is evidenced by the fact that it took 22 months from the Spin–Off for the two companies finally to agree upon the terms of their operational separation. The assets that are the subject of that agreement give rise to the majority of ACC's administrative claims.

In the twelve weeks between the Spin–Off (January 11, 2002) and ABIZ's Initial Petition Date (March 27, 2002), little was done to clarify or further effectuate the operational separation of ABIZ and ACC, or to untangle their assets and contractual rights and obligations. This situation created significant confusion for ABIZ upon its entry into bankruptcy. In the year and a half since then, ABIZ has made considerable efforts to finalize its operational separation from ACC. For many months, ABIZ and ACC have jousted with respect to claims against each other, and I think it is fair to say that each has been trying to exert as much leverage as it could on the other, in no small part as a consequence of the influence of the creditors of each estate, with whom each debtor has been cooperating. About a week ago, ABIZ and ACC at last reached an agreement in principle with ABIZ on the terms of their *operational* settlement. But I underscore *operational.* A final written agreement was executed on December 3, 2003, with the closing to take place some months in

the future, after schedules are finalized and necessary consents are obtained. ACC and ABIZ have not, however, reached agreement as to the larger settlement, with respect to amounts, if any, that are due from ACC to ABIZ, and the amounts, if any, that are due from ABIZ to ACC, though a resolution of these issues will be important to the ultimate success of each entity.

*ACC's Administrative Expense Claims*

On November 26, 2003, ACC filed its proof of claim for administrative expense claims "in an amount not less than $71 million." As described by ACC, these claims consist of the following components:

| Claim | Amount |
| --- | --- |
| DIP Claim | $16.8 million |
| Network Asset Claim | $40 million (approximately) |
| Shared Services Claim | $12 million (approximately) |
| Circuit Refund Claim | $ 2 million (approximately) |

ABIZ asks that I estimate these claims—today for feasibility purposes alone—at an amount that is no more than $1 million. ABIZ asserts that the DIP claim—which with little or no dispute as to amount is $16.8 million—is subject to various defenses, as well as set-offs that far exceed the amount of the DIP claim. Of the remaining claims, totaling approximately $55 million, ABIZ asserts that nearly $10 million of those claims are subject to the same set-offs. It also asserts that the remainder of ACC's claims have no merit, and that some of them, relating to charges for network assets use it contends never should have been billed to it, are also offset by charges for similar assets that ABIZ would bill ACC for if it were to be determined that charges of that character have to be paid.

Discussion

1. *The Feasibility Requirement*

Bankruptcy Code section 1129, which sets forth the requirements for confirmation, provides, in relevant part:

(a) The court shall confirm a plan only if all of the following requirements are met:

. . .

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

 This requirement is commonly referred to as the feasibility requirement. Its purpose is to protect creditors against unrealistic plans that have little or no chance of success. As stated by the Ninth Circuit:

The purpose of section 1129(a)(11) [of the Bankruptcy Code] is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir.1985) *(quoting 5 Collier on Bankruptcy* ¶ 1129.02, at 1129–36.11 (15th ed.1984)). However, just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility. The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds. *See In re U.S. Truck Co., Inc.*, 47 B.R. 932, 944 (E.D.Mich.1985). Nor need success be guaranteed. *See Kane*, 843 F.2d at 650.

 In making determinations as to feasibility, however, a bankruptcy court does not need to know to a certainty, or even a

substantial probability, that the plan will succeed. All it needs to know is that the plan has a reasonable likelihood of success. *See Kane v. Johns–Manville Corp.,* 843 F.2d 636, 650 (2d Cir.1988) (the feasibility standard is whether the plan offers a reasonable assurance of success). *In re Texaco Inc.,* 84 B.R. 893, 910 (Bankr.S.D.N.Y. 1988) (Schwartzberg, J.) ("All that is required is that there be reasonable assurance of commercial viability"); *In re Johns–Manville Corp.,* 68 B.R. 618, 635 (Bankr.S.D.N.Y.1986) (Lifland, C.J.) ("The plan proponent is not required to guarantee the ultimate success of the reorganized company") (citations omitted); *In re Prudential Energy Co.,* 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986) (Buschman, J.) ("Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under § 1129(a)(11). Most debtors emerge from reorganization with a significant handicap. But a plan based on impractical or visionary expectations cannot be confirmed").

■ Only one impediment to feasibility has been identified in this case, but it is a substantial one. It is the $71 million admin claim asserted by ACC, and it raises concerns in the context of the requirement of section 1129(a)(9)(A) of the Code that requires that on the effective date of a plan, all admin expenses must be paid in full. The ABIZ plan proponents argued, and it was shown to my satisfaction, that the confirmation of ABIZ's plan would be unduly delayed if a claim of the complexity of the ACC claim were to be fully litigated, and hence they argued that I should estimate the ACC claim.

In this respect, I agreed with the ABIZ plan proponents in part; I agreed that estimation was appropriate for determining feasibility, if its requirements could otherwise be satisfied, but I rejected their contention that the actual allowance of the ACC admin claim could be done with such little due process. I think it would be helpful for me to pause to explain my rationale for each of the two prongs of that ruling.

Bankruptcy Code section 502 provides:

(c) There shall be estimated for purpose of allowance under this section—

(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case. . . .

■ Estimation, authorized under section 502(c) of the Code, provides a means for a bankruptcy court to achieve reorganization, and/or distributions on claims, without awaiting the results of legal proceedings that could take a very long time to determine. *See In re Continental Airlines, Inc.,* 981 F.2d 1450, 1461 (5th Cir. 1993) (Bankruptcy Courts may estimate claims under § 502(c)(1) in order to (i) "avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions," and (ii) "promote a fair distribution to creditors through a realistic assessment of uncertain claims").

■ In that connection, it has been repeatedly held, including in cases at the Circuit Court of Appeals level, that when estimating claims, Bankruptcy Courts may use whatever method is best suited to the contingencies of the case, so long as the procedure is consistent with the fundamental policy of Chapter 11 that a reorganization "must be accomplished quickly and efficiently." *Bittner v. Borne Chemical Co.,* 691 F.2d at 135–37; *see also, e.g., In re Brints Cotton Mktg., Inc.,* 737 F.2d 1338, 1341 (5th Cir.1984), citing 3 *Collier on Bankruptcy* ¶ 502.03, at 502–77 (15th ed.1983). Bankruptcy Courts have em-

ployed a wide variety of methods to estimate claims, including summary trial, *In re Baldwin–United Corp.,* 55 B.R. 885, 899 (Bankr.S.D.Ohio 1985), a full-blown evidentiary hearing, *In re Nova Real Estate Inv. Trust,* 23 B.R. 62, 65 (Bankr.E.D.Va.1982), and a review of pleadings and briefs followed by oral argument of counsel, *In re Lane,* 68 B.R. 609, 613 (Bankr.D.Haw. 1986). In so doing, courts specifically have recognized that it is often "inappropriate to hold time-consuming proceedings which would defeat the very purpose of 11 U.S.C. § 502(c)(1) to avoid undue delay." *In re Windsor Plumbing Supply Co.,* 170 B.R. 503, 520 (Bankr.E.D.N.Y.1994).

▪ Section 502, on its face, speaks of claims, which arise before the filing of a case, and does not address admin claims. Nevertheless, a fair number of cases have held that estimation can likewise be used for admin claims. *See, e.g., In re Mac-Donald, supra,* 128 B.R. 161, 164–165 (Bankr.W.D.Tex.1991) (Clark, J.). Although § 502(c) on its face applies to prepetition claims, "[c]ourts have nonetheless assumed that the estimation process in section 502(c) may be equally employed for estimating post-petition claims, when necessary to avoid delaying the administration of the bankruptcy case (especially when it comes to the confirmation process)." *Id.* at 165.

There is persuasive authority permitting me to estimate for feasibility purposes. In *MacDonald,* Judge Leif Clark, one of the country's most respected bankruptcy judges, got it exactly right, in my view, when he regarded it as appropriate to use estimation for feasibility purposes but not for allowance purposes. That reflected an appropriate evaluation of the strengths and weaknesses of estimation. Estimation is effective, as I noted, for enabling bankruptcy cases, and chapter 11 cases in particular, to move forward and to get recov-

eries into the pockets of creditors without delaying the whole process as a consequence of a limited number of very complex claims. But especially since the caselaw makes it clear that Bankruptcy Courts have a great flexibility in estimation procedures, it raises risks of the denial of due process, and Bankruptcy Courts need to be sensitive to this concern.

In the present case, estimation of ACC's administrative claims, to the extent the requirements of section 502(c) are satisfied, is necessary and appropriate, because, in the absence of estimation, "the fixing or liquidation of" those claims "would unduly delay the administration of the case." 11 U.S.C. § 502(c). ABIZ is unable to establish a cash reserve in an amount that approaches what is anticipated to be the asserted aggregate amount of ACC's administrative claims. Estimation thus is an essential prerequisite to confirmation of the Plan.

However, it is not, in my view, likewise an essential prerequisite to fixing the allowed amount of ACC's admin claim. When we get to that, I will be very likely to follow many of the other aspects of *MacDonald,* such as Judge Clark's rejection of the view that the estimated amount of a post-petition administrative claim necessarily sets the outer limit of a claimant's right of recovery. He noted that were the estimation process to set the outer limits of allowance for such claims, the due process rights of such claimants would be jeopardized to a troublesome degree.

He said:

The better rule seems to be that estimation primarily serves to assist the court and parties in interest in evaluating the feasibility of a given plan under Section 1129(a)(11). In addition, the estimation process may fulfill the allowance requirement for purposes of Section 1129(a)(9), but will not . . . set the "outer

limits of a claimants' right to recover." Rather, the ultimate allowance of the claim will set that right.

128 B.R. at 167–168.

### 2. Estimation Procedures

■ Consistent with that, ACC has not protested the use of estimation for feasibility determinations (as contrasted to claims allowance) for any aspects of its claims that are otherwise subject to estimation. ACC does argue, however, that section 502(c)(1), by its terms, permits only the estimation of a contingent or unliquidated claim, and does not authorize estimation of a liquidated claim. Thus, while ACC does not quarrel with estimating (for feasibility purposes) most of the aspects of its admin claim, it argues that I cannot estimate the portion of its claim relating to repayment of the DIP, which plainly is liquidated in amount.

The ABIZ plan proponents do not dispute that the amount due on the DIP is liquidated, but contend that as a consequence of their defenses to the repayment of the DIP, they have taken it out of the general rule. They argue, in substance, that their contention that ACC materially breached the DIP eliminates ACC's claim in contract, and that the alternative bases for ACC to be repaid on it, quantum meruit, unjust enrichment and the like, are unliquidated claims. They also argue that their counterclaims against ACC would make ACC's otherwise liquidated claim unliquidated. I do not understand them to contend that it's contingent, and in any event it's obvious that it is not.

The distinction is not material now, because I can gauge feasibility by means other than estimation of ABIZ's liability on the DIP, but since the issue will be coming up again on claims allowance, I must note my agreement with ACC in this respect. I cannot agree that any time one disputes an otherwise liquidated claim, or asserts a counterclaim, that makes that claim unliquidated. When it is time to determine the allowance of the DIP claim, we'll have to do it the normal way, which is by the litigation of a contested matter.

■ With respect to estimation and the means to do it, I take my guidance from Chief Judge Brozman's decision in *Ralph Lauren Womenswear*. As she noted there, neither the Code nor the Rules prescribes any method for estimating a claim, and it is therefore committed to the reasonable discretion of the court, *In re Hydrox Chemical Co.*, 194 B.R. 617, 623 (Bankr.N.D.Ill.1996), which should employ whatever method is best suited to the circumstances of the case. *Id.; see also In re Thomson McKinnon Securities, Inc.*, 191 B.R. 976, 979 (Bankr.S.D.N.Y.1996) (Connelly, J.).

As Judge Brozman described the estimation process most commonly used:

A trier of fact first determines which version [of the facts] is most probable and proceeds from there to determine an award in a fixed amount. An estimator of claims must take into account the likelihood that each party's version might or might not be accepted by a trier of fact. The estimated value of a claim is then the amount of the claim diminished by [the] probability that it may be sustainable only in part or not at all.

197 B.R. at 775, citing *In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 521 (Bankr.E.D.N.Y.1994). She continued:

Thus, to the extent that I have had to analyze the facts presented by the parties, I have sought not to make definitive findings of fact, but instead to assess the probabilities of the various contentions made by the parties passing muster upon my final adjudication of Kreisler's

claim. In contrast, the parties' legal arguments must be evaluated not for the probability that they have merit, but rather for their correctness as a matter of governing law. *In re Thomson McKinnon Securities,* 191 B.R. at 979 (in estimating a claim, court is "bound by the legal rules which may govern the ultimate value of the claim.").

I agree with ABIZ that there can be problems with a hard and fast rule requiring one to use probabilities, because if you did, it could be skewed by people making astronomical claims, and even a 1% probability would yield an unreasonably large result. But that risk is reduced, even though it is not wholly eliminated, when the claim is a sum of individual components, which requires a greater degree of thoughtfulness before assertion, and where you can aggregate the individual components. It also is reduced, if not eliminated, if the Court considers the gross amount claimed to be colorable. Here, because I have problems with some of the amounts ACC claimed but do not regard the amounts claimed to be frivolous, I don't have to decide what I would do if I thought a claimant was making a demand with no apparent basis in fact or law. On the facts here, I don't have to decide that issue.

The amounts that I'm asked to estimate come in two areas. The first is the asserted duty to pay back the DIP, an obligation of $15 million in principle plus about another $1.8 million in interest. The second is the series of a variety of asserted post-petition obligations, representing charges for access to network assets, and asserted entitlement to refunds, and various insurance, personnel, and automotive lease allocations. I can, and will, estimate the latter. As noted, I don't think I can estimate the DIP obligation, because it's a claim for a liquidated amount. The only issue is whether or not it is to be repaid.

### 3. Preference Recovery

I need to address the preference claim that ABIZ says it may assert first, because that will set the table for certain things, principally those of set-off, that will follow.

On or about October 1, 2001, ACC—which, at the time, still owned more than 78% of ABIZ's stock and controlled more than 95% of its voting power—caused several ABIZ entities to enter into a series of asset purchase and sale agreements pursuant to which ABIZ conveyed to one or more ACC subsidiaries assets relating to the ownership and operation of local telecommunications systems in various communities in Upstate New York, Virginia and New England. At the time of these conveyances, ACC valued these assets, in the aggregate, at $150 million, and it obtained a fairness opinion approving this valuation. In exchange for these conveyances, ACC provided, or purported to provide, to ABIZ consideration totaling $150 million, consisting of (i) the actual payment of $80 million in funds to an ABIZ subsidiary, (ii) the satisfaction of antecedent inter-company indebtedness of approximately $61 million said to be owed by ABIZ to ACC, and (iii) ACC's assumption of $9 million of liabilities.

According to journal entries maintained by ACC, ABIZ was indebted to ACC in an amount in excess of $571 million as of shortly before that October 1, 2001 date. As of October 1, 2001, that indebtedness to ACC was reduced by about $77 million.

As to the $80 million that was paid to ABIZ's subsidiary ABS New York by ACC in connection with the same transaction, all but $5,000 of those funds were transferred back to the same ACC bank account from which they originated within eleven days after the payment of those funds to ABS New York. These transfers of funds back

to ACC were used to further pay down ABIZ's indebtedness to ACC.

ABIZ contends that it was not actually indebted to ACC at this time, as it contends that the ACC expenditures that were booked as debt were in fact capital expenditures. If that is so, the payments may have been a fraudulent conveyance, but I make no finding today as to that issue. Rather, I assume, without deciding, that the debt was real, and that these were merely payments on antecedent debt. The transfer of $141 million to ACC in satisfaction of the indebtedness to ACC, and the transfer of the $80 million shortly thereafter, was effectuated in October 2001, which was less than one year prior to both ABIZ's March 2002 petition date, and the subsequent petition date of the other ABIZ Debtors (June 18, 2002). At the time, ACC was the controlling shareholder of ABIZ, and thus an insider. For the purposes of feasibility only, I find that ABIZ was insolvent at the time of the transfers.

Thus, subject to any affirmative defenses that might apply, such as the ordinary course or new value exceptions, there was here a slam-dunk preference.

For purposes of feasibility, ABIZ has given me a fair degree of comfort that it will succeed in showing a preference, in both the $60 million that was applied to the reduction of ABIZ indebtedness to ACC, and also the $80 million that was paid into the ACC cash management account. When we're talking about wire transfers, of many million dollars a pop, and the efforts by an insider, ACC, to pay itself on indebtedness said to exist for its own purposes, I'm not impressed by its assertion that it will be likely to make out an ordinary course affirmative defense, and certainly I heard no evidence over the course of the hearing that would lead me to believe that such a defense could be

made out. Nor have I seen proof of new value.

Bankruptcy Code section 550 provides, in relevant part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section … 547 … of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

Given the manner in which ACC used the cash management account, as admitted by it in its own pleading (see Movants Exh. 22, ¶¶ 32, 38, 41, 45–46 & n. 8), and the fact that the funds were paid by ABIZ into the very account from which the DIP loan was made, I think the probability is very high that the asserted lack of mutuality of set-off will not be successful. That is especially so given the breadth of reach of section 550.

Thus I believe that ABIZ will likely succeed in establishing set-off to the extent the set-off is post-petition for both itself and ACC.

### 4. The DIP Loan

■ ACC has asserted an administrative expense claim of approximately $16.8 million against ABIZ under the DIP Credit Agreement. This claim consists of $15 million, which is the outstanding principal of the funds that were provided to ABIZ under the DIP Credit Agreement, plus $1.8 million of unpaid interest that has accrued on that unpaid principal.

ABIZ contends that the DIP claim should be estimated at zero. It contends that ACC breached the DIP credit agree-

ment, and that it has defenses and counterclaims against ACC arising from ACC's asserted breach of the DIP Credit Agreement that could, by themselves, reduce the value of ACC's claim to zero. It also contends that I don't have to reach the issue of its asserted breach, because it has a set-off against the DIP loan claim that, by itself (and without consideration of the claim of breach), eliminates the claim.

When the ABIZ DIP loan was put into place, the Rigases were still in control of ACC. As originally envisioned, ACC and a Rigas affiliate would lend an aggregate of $135 million, with ACC lending $67.5 million, in a tranche that would be advanced first, and a Rigas affiliate lending the second $67.5 million, in a tranche that would be advanced later. An interim DIP order was entered, authorizing ABIZ to take down $27 million from the ACC tranche, but by reason of events that followed, a final DIP order with respect to this loan was never entered. The evidence presented on this motion satisfies me that ACC made an aggregate of $15 million in advances under the DIP loan, of the total of $27 million that was to be advanced under the interim DIP order, but that it failed to advance any more. The inference is strong, even on this record, that the reason was the events that took place in May 2002, relating to the changes in management at ACC, *i.e.*, the departure of the Rigases, at about which time ACC also went into default on much, if not all, of its borrowed money debt and credit lines, but I need not make that finding today. It is sufficient for me to find, and I do find, that ACC told ABIZ, on or about May 17, 2002, that ACC was unable to fund more than $2 million of a draw request ABIZ had made shortly before that time, and that ACC was not in a position to, and would not, make further disbursements on the facility—and that it made no further advances, although such were duly requested. No evidence has been shown to me on this motion that ABIZ was then in breach of the facility, especially in a manner sufficient to relieve ACC of its duty to fund. Indeed, when ABIZ sent ACC its demand letter, ACC did not then respond with assertions of any breach or failure to satisfy funding conditions by ABIZ. It is possible that ACC might be able to make such a showing in the future (if, for example, it were shown that ABIZ failed to pay the fees required under the facility, that such were duly demanded and remained unpaid, and payment of such had not been waived) but ACC hasn't made that showing to me yet. I find, for the purposes of feasibility only, that it is considerably more probable than not that ACC was in material breach of the DIP facility.

ABIZ was then compelled to obtain alternative financing. ABIZ was able to obtain only $15 million of such financing, which was obtained from Beal Bank on terms that were less favorable than the terms of the DIP Credit Agreement. ABIZ has shown to my satisfaction, solely for the purpose of determining feasibility, that in addition to the higher costs resulting from the terms of the Beal Bank financing, ABIZ incurred significant out-of-pocket costs in connection with the professional fees charged by the various parties in these bankruptcy cases, and may have suffered substantial consequential damages due to the forced closure and sale of certain markets and the resulting loss of business opportunities. I do not decide today whether ABIZ has the ability to recover these damages, or any portion of them, if it elects to be relieved of the DIP credit agreement and thereby be relieved of the duty to pay back the money advanced by ACC.

As I have noted, I don't think the liability on the DIP can be estimated, so I look at feasibility, insofar as it would be affect-

ed by the duty to repay the DIP, under basic feasibility analysis, looking to see whether the probability of allowance of an ACC claim for repayment of the outstanding DIP balance makes it unlikely that the ABIZ plan will succeed. I believe that such a showing hasn't been made (or, more precisely, that the ABIZ plan proponents have shown me that their plan still has a reasonable probability of success), though I cannot agree with all of the positions of the ABIZ plan proponents in this regard.

One of the ABIZ plan proponents' arguments is that they can assert set-offs and counterclaims against the DIP financing debt. Relevant to that is language in the DIP financing Credit Agreement. The Credit Agreement provides, in its section 2.10 (captioned "Payments and Computations"), that:

> (a) The Borrowers shall make *each* payment hereunder (including fees and expenses) not later than 2:00 P.M. (Pittsburgh, Pennsylvania time) on the day when due, in Dollars, to the Administrative Agent by wires transfer of immediately available funds to the Loan Account *without set-off or counterclaim.* The Administrative Agent will promptly thereafter cause to be distributed immediately available funds relating to the payment of principal or interest or fees to the Lenders, in accordance with the application of payments set forth in clauses (f) and (g) of this Section 2.10 as applicable. . . .

(emphasis added; italics on immaterial matter deleted).

At least on this record, I find, for the purposes of feasibility only, as either a fact or mixed question of fact and law, that this language, which is unambiguous, applies to *any and all* payments ABIZ would be required to make, and not just periodic payments of interest. The word "periodic" is conspicuously lacking in Section 2.10,

and the word "each" that appears in Section 2.10 is not ambiguous. I also find that neither section 2.4 nor 7.8 of the Credit Agreement, each of which is silent with respect to set-off, provides a basis for an exception to that general rule. Indeed, since the credit agreement provides that ABIZ is required to make principal payments only at the end of the loan, as a kind of balloon, the reference in Section 2.10 to principal, as well as interest, reinforces the conclusion that Section 2.10 is intended to apply to *every* payment, and not just the periodic payments, which would be of interest only.

Thus I find that in the DIP Credit Agreement, ABIZ waived the right to assert set-offs and counterclaims. Section 2.10 says so in no uncertain terms. That waiver thus initially applies to the relation between the parties, though only to the extent that the various covenants in the loan agreement are enforceable by ACC generally.

But for the purposes of determining feasibility, and for this purpose alone, I find that ACC, by both performance breach and anticipatory repudiation, materially breached the DIP credit agreement, and hence is unable to avail itself of covenants in the DIP Credit Agreement. I assume, without deciding, that this might not foreclose it from recovering amounts advanced, and arguably interest, on alternate theories, such as quantum meruit, unjust enrichment or the like, but as a matter of non-bankruptcy law, these would then be subject to any other applicable defenses, such as claims of set-off; contractual waivers of set-off that would otherwise be applicable, as having been included in the agreement, would fall with the remainder of the loan agreement.

It is thus appropriate next to consider the assertions of set-off.

I think that if the ABIZ plan proponents could show that ACC breached the DIP financing Credit Agreement—as they have satisfied me now, for purposes of plan feasibility only—they would then be able assert defenses (*e.g.,* claims of set-off) and counterclaims (though it is not clear that these would be large enough to reduce the amount owed to ACC in a sufficiently large amount) to any claims for quantum meruit, unjust enrichment, or the like, as a matter of non-bankruptcy law. But it's a closer, and fairly debatable, question, from the perspective of both sides, as to whether the estate can set-off against a post-petition obligation—especially a superpriority one—with a pre-petition claim, such as the preference claim here, as a matter of bankruptcy law. And when we get to the claims allowance stage, I'm going to want to get more briefing on that. I agree with the ABIZ plan proponents that section 553 doesn't apply, as that deals with a *creditor's* ability to take a set-off, and not a debtor's, and I'm not aware of anything else in the Code that forbids it. But I am concerned that such a holding would be a red flag to the vendor community and chill post-petition shipments to debtors in possession. (I don't know whether or not it would present a comparable threat to post-petition financing, as DIP lenders are capable of drafting their documents to secure waivers such as the one we have here, and I've never seen a DIP loan yet that didn't have a waiver of set-offs. Those will normally be enforceable except in the very rare case—this is the first I've ever seen—where there's a colorable claim of breach by the DIP lender.) For the time being, however, and for purposes of feasibility only, I think it's fair to conclude that since there is no apparent statutory prohibition against the set-off the ABIZ plan proponents wish to assert, and no longer a contractual prohibition against it, the ABIZ plan proponents will succeed in asserting set-offs with respect to both the DIP financing claim and other asserted set-offs to the extent to which they relate to ACC's pre-petition period.

ABIZ's preference claims, whether thought of as $141 million, $80 million or $60 million, are pre-petition claims against ACC, in ACC's chapter 11 case, and the entirety of ACC's administrative claim for $16.8 million arising from the DIP Credit Agreement, and chunks of ACC's claims against ABIZ for other aspects of ACC's admin claims, arose at times that are pre-petition in ACC's chapter 11 case. If a set-off may be taken, ACC's claim for the $16.8 million, whether in contract, quantum meruit, or for unjust enrichment, would be offset by the preference claims, and for the purposes of feasibility, I note that the fact that ABIZ has not brought these claims yet is not determinative. As I have noted above, this determination is in the context of findings I have made above, for the purpose of feasibility only, that there was a waiver of the right to take a set-off in the DIP Credit Agreement, but if the DIP Credit Agreement was materially breached, ACC cannot avail itself of the protections of that provision.

For purposes of feasibility only, I find that there is not a material concern that ABIZ would be required to make outlays on the effective date of the plan for repayment of the $16.8 million in connection with the DIP.

### 5. *The Other Admin Expense Claims*

#### a. *Network Assets*

ACC's network asset claim, which originally was in the amount of approximately $40 million, has been reduced to about $25 million, for the purposes of this feasibility dispute only, by reason of an uncertainty in the ownership in the assets for which ACC sought to bill ABIZ. The

claim is for compensation assertedly due to ACC for ABIZ's use of shared assets that were the subject of the recently-concluded negotiations about operational separation. These shared assets are predominantly long-haul fibers and related components, including the fiber network, conduit, over-lash rights, land usage, collocation space, power and network maintenance services, of regional systems that provide service between local systems and, in some cases, local network systems that are integrated into existing ABIZ network assets.

As I have noted above, ACC and ABIZ have for many years shared hard assets, under circumstances under which their ownership, vis-à-vis each other, was unclear. The allocation of those hard assets was a major component of the recently concluded operational separation agreement. Many of these network assets were built by ACC and ABIZ in circumstances where ownership of any particular component was far from clear. Portions were built by ABIZ personnel, portions were built by ACC personnel, portions were built by ACC and ABIZ personnel working together, and portions were built by ABIZ or ACC personnel working with third parties. Some assets were owned of record by ACC, and some were owned of record by ABIZ, but in many cases the assets were used by the entity that was not the record owner.

Without dispute, ACC and ABIZ historically never billed each other for the use of these assets, even after the Spin–Off, which took place in January 2001. However, sometime in the late Winter or Spring of 2003, and as announced by the issuance of an invoice in May 2003, ACC's current management determined to bill ABIZ for these assets. The ACC invoice came after ACC's receipt of a letter dated April 22, 2003, in which counsel to the ABIZ Creditors' Committee and Secured Noteholders Committee jointly advised ACC of very substantial claims contemplated by the ABIZ estate against ACC for veil-piercing, fraudulent conveyance, preference and other matters.

I need not make a finding, and do not make a finding, as to whether or not the sending of the invoice by ACC to ABIZ in May 2003, the possibility of which was considered by ACC's Joseph Bagan at an earlier time, between the time of his February 2003 arrival at ACC and the time of receipt of the ABIZ demand letter of April 22, was some kind of a tactical or other response to the ABIZ demand letter. I note merely that it covered the entire period from ABIZ's petition date, and therefore consisted of more than $27 million in back-billing. Since then, ACC has continued to render monthly invoices for these items in amounts of approximately $2 million per month.

The ABIZ plan proponents argue that an oral, legally binding, settlement agreement was reached in January or February 2003 to the effect that neither side would bill the other for network assets, at least for periods prior to the conclusion of agreements addressing ownership and charges for use on a going-forward basis. But I think that when we face that issue at the claims allowance stage, I likely will find that even assuming, *arguendo*, that an oral "handshake" deal was reached at that time, it was not legally binding.

Standards for considering whether a preliminary agreement is a binding contract, on the one hand, or whether it is an unenforceable agreement to agree, on the other, were expressed by Judge Leval (then in the Southern District, now on the Second Circuit) in *Teachers Insurance & Annuity Association of America v. Tribune Co.*, 670 F.Supp. 491, 497–503 (S.D.N.Y.1987) ("*TIAA v. Tribune*"), and applied in numerous Second Circuit deci-

sions. *See Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 71–73 (2d Cir.1989); *Shann v. Dunk,* 84 F.3d 73, 77–78 (2d Cir.1996); *Adjustrite Systems, Inc. v. GAB Business Services, Inc.,* 145 F.3d 543, 547–551 (2d Cir.1998). While these cases were decided under New York law, I have not yet seen anything to lead me to believe that Pennsylvania law would be different.

 It is a fundamental principle of contract law that no contract can be formed unless the parties intend to be bound. *See Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir. 1985); *In re Atlantic Computer Systems Inc.,* 142 B.R. 659, 660 (Bankr.S.D.N.Y. 1992) (Lifland, J.), *aff'd* 154 B.R. 166 (S.D.N.Y.1993). "Under New York law, if parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs." *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir.1984) (citations omitted). A primary concern for courts that are confronted with this issue is "to avoid trapping parties in surprise contractual obligations that they never intended." *TIAA v. Tribune,* 670 F.Supp. at 497. As Judge Leval stated in *TIAA v. Tribune:*

> Ordinarily in contract negotiation, enforceable legal rights do not arise until either the expression of mutual consent to be bound, or some equivalent event that marks acceptance of offer. Contractual liability, unlike tort liability, arises from consent to be bound (or in any event from the manifestation of consent). It is fundamental to contract law that mere participation in negotiations and discussions does not create binding obligation, even if agreement is reached on all disputed terms. More is needed than agreement on each detail, which is

overall agreement (or offer and acceptance) to enter into the binding contract. *Id.; see also Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257 (2d Cir.1984), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984) (prospective seller was not bound by alleged contract to sell its subsidiaries where documents and testimony showed intent of both parties was not to be bound until execution of a formal written contract); *Winston,* 777 F.2d at 80 (reversing district court and concluding parties never entered into binding settlement agreement); *Brause v. Goldman,* 10 A.D.2d 328, 332, 199 N.Y.S.2d 606, 611 (1st Dep't 1960), *aff'd,* 9 N.Y.2d 620, 210 N.Y.S.2d 225, 172 N.E.2d 78 (1961) (necessary finality of assent is lacking where parties have clearly expressed an intention not to be bound until their preliminary negotiations have culminated in the execution of a formal contract). As Judge Leval noted in *TIAA v. Tribune,* "[t]here is a strong presumption against finding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents." 670 F.Supp. at 499.

In applying the principles set forth above to this case, I likely will not be in a position to find an intent of the parties to bind themselves by the alleged oral agreement. Mr. Babcock candidly acknowledged, on cross, that he understood that the settlement would later be reduced to writing, and also that it would be subject to court approval. (See Rough Tr. at 98). With neither of these having happened (and with the parties having entered into a quite different deal, in December 2003, which expressly reserved their rights in that regard), I think it is most unlikely that I will be able to find a binding agreement as to the parties not charging each other back in January or February of 2003.

So that means ABIZ isn't off the hook by agreement for the network access payments. But that isn't the end of the story. To determine whether ACC is entitled to an admin claim on this, I'd have to conduct a double-barreled inquiry as to whether ACC is entitled to payment as a matter of non-bankruptcy law, and if so, whether it's entitled to an admin expense priority under bankruptcy law, under cases like *Amalgamated Ins. Fund v. McFarlin's, Inc.,* 789 F.2d 98, 101 (2d Cir.1986) (*"McFarlin's"*); *In re Enron Corp.,* 279 B.R. 79, 85 (Bankr.S.D.N.Y.2002) (Gonzalez, J.) (*"Enron"*); *In re Jartran, Inc.,* 732 F.2d 584, 587 (7th Cir.1984) (*"Jartran"*); *In re FBI Distribution Corp.,* 330 F.3d 36 (1st Cir.2003) (*"Filene's Basement"*); *In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir.1976) (*"Mammoth Mart"*) (Act Chapter XI case) and my recent decision in *In re Adelphia Business Solutions, Inc.,* 296 B.R. 656 (Bankr.S.D.N.Y.2003), in the *ABIZ* and *ACC* cases on the Verizon motion. To a certain extent, the two prongs of that inquiry overlap, however, because to the extent ABIZ used assets that actually belonged to it, ABIZ wasn't unjustly enriched by their use, nor was there a benefit to the ABIZ estate.

I think ACC may have problems making the necessary showing for an entitlement under quantum meruit, and also think that ABIZ will have a good chance to show an equitable estoppel. ACC didn't bill ABIZ for the network assets for quite a long time, from the time of the spin-off, in Jan 2001, to May 2003, almost 2–1/2 years later. The budget didn't provide for payment of them. Assuming, as I do for purpose of today's analysis, that ACC's Mr. Bagan came up with the idea of billing ABIZ for access to network assets *before* ABIZ delivered the letter it did asking for such huge sums from ACC, and not after, ACC nevertheless has the problem that in order to recover on quantum meruit, it

must be seeking payment for which ABIZ should have known it would be required to make payment, and ABIZ plainly lacked such an expectation before May 2003.

In this connection, I find that it is true, as ABIZ asserts, that prior to finalization of the DIP agreement that then existed between ABIZ and ACC, ABIZ prepared a schedule of cash needs that was submitted to ACC and approved by ACC in its capacity as DIP lender. It is also true that my order approving borrowing by ABIZ under the ACC credit agreement authorized ABIZ to borrow from ACC on the terms and conditions set forth in the DIP Credit Agreement, including the condition that ABIZ's expenditures not materially exceed those provided for in the ABIZ cash needs schedule that ACC had approved. It did not provide for the payment by ABIZ to ACC of any charges for the use of network assets, let alone charges of the magnitude that ACC is now asserting, which came to approximately $2.2 million per month.

ABIZ contends that ACC's approval of this schedule evidences its contemporaneous understanding that neither party was entitled to bill the other party for the use of network assets. For the purposes of feasibility only, I find that argument persuasive, along with a variant of it—that ACC did not then have an expectation of payment for the network assets.

Both during the time preceding the dispatch in May 2003 of the $27 million invoice, and thereafter, during which time ACC did not make known any expectation of payment for use of network assets, ABIZ did not pay or put money into a reserve for payment. For purposes of feasibility alone, I find ABIZ would indeed be materially prejudiced if ACC were permitted now to recover a purported administrative expense that has since grown to a size that ABIZ could not possibly pay.

Thus, though the matter is not free from doubt, ABIZ has a good chance of showing reasonable reliance, and a good chance of making out an equitable estoppel. The failure to include these payments on the budget, if indeed they were required, supports the ABIZ position. ABIZ would have EBITDA losses with or without being charged for the use of assets said to be owned by ACC in many of the time periods shown on the budget—in no small part, that is what the DIP financing was for—but without being charged by ACC for network assets, ABIZ would suffer such losses to a considerably lesser extent, and I am confident that if the problem were identified sooner, ABIZ or its creditors would have dealt with it sooner, long before confirmation.

If I were required to estimate this, I would estimate this dispute as 60–40 in ABIZ's favor. If ACC's 40% likelihood of a win were multiplied by the $25 million in controversy, that would still leave an estimated amount of $10 million. But for two reasons, I don't regard that as the end of the story, at least for feasibility purposes.

First, there are the set-offs resulting from the preference claim that I discussed a few moments ago. They are sufficiently large to cover all of ACC's admin claims to the extent that set-offs can be taken, but without dispute, the ABIZ set-off claims against ACC, which are all pre-petition claims against ACC when considering the ACC—and not ABIZ—cases, can only be used as a set-off against claims by ACC that arose pre-petition in the ACC case, and not post-petition in the ACC case. ACC filed later than ABIZ, by about 3 months. About $10 million—$9.8 million to be more exact—of the ACC claims that are admin claims against ABIZ arose prior to the ACC filing date; thus are in the pre-petition period vis-à-vis ACC; and can be set-off against the ABIZ preference claims that likewise are pre-petition claims against ACC.

ACC seeks a gross amount of $2.1 million per month (or $1.26 million per month, after costs of $826,832 per month for the Virginia Ring asset are carved out, as ACC did solely for the purpose of feasibility) for use of network assets. ABIZ acknowledges that some of this is due, but contends that the amount due is only about $824,000 per month, by reason of its assertions that ABIZ, rather than ACC, owns the assets in question, and other technical assertions. The difference between the $1.26 million per month ACC claims and the $824,000 per month ABIZ acknowledges is due, on a matter this technical, is the classic meat of estimation. I accept ACC's suggestion that matters of this character warrant a determination that there would be about a 50% probability that either position is right, and I estimate the shared assets liability at $1.042 million per month.

But second, I think there is a huge other matter that I must take into account, which, at least for feasibility purposes, makes it unnecessary and inappropriate to consider that amount to be due on the effective date of the ABIZ plan.

Assuming, as I do, that there was no binding agreement between ACC and ABIZ that either would refrain from charging the other for network assets, ABIZ is free to charge ACC for the use of its assets, just as ACC now wants to charge ABIZ for the use of ACC assets. ABIZ never billed ACC for use of network *assets,* though ABIZ has historically billed ACC for use of network and other telephonic *services,* which are not the same thing. ABIZ contends that if it did so bill ACC, the amount due to ABIZ for the services ABIZ provided would exceed the amount ACC billed ABIZ for network services for which ABIZ acknowledges it is liable. Specifically, ABIZ has introduced

evidence showing that the value of the network assets ABIZ provided to ACC, if I were to determine that network assets are appropriately billable as between the two debtor estates, would be about $890,000 per month—an amount that comes fairly close to, though it does not exceed, the amount I have estimated to be due for network services. For the purposes of feasibility only, I find that there is a net administrative expense due to ACC of about $152,800 per month, for a total, for the 19 months in question, of about $2.9 million—$2,903,000 to be exact.

For purposes of feasibility only, I find that there is not a material concern that ABIZ would be require to make outlays on the effective date of the plan for network assets.

### b. The Shared Management Services Claims

ACC's administrative claims also include claims for approximately $12 million allegedly arising under a Management Services Agreement dated April 10, 1998, between ACC and ABIZ. Pursuant to this Agreement, ACC provided managerial and related services to ABIZ and also purchased goods and services on ABIZ's behalf. The Agreement provided that, as compensation, ABIZ would pay ACC "an amount necessary to pay a reasonable allocation of the compensation and allocable costs for the employees of [ACC] and a reasonable share of the other direct and indirect overhead expenses of [ACC], including, without limitation, its allocable share of any space rented or owned by [ACC]," all of which "shall, unless otherwise agreed, be based on a pro-rata share of the department expenses, as agreed to by the parties for the applicable Service." I accept for the purpose of feasibility only that these allocations always were determined by ACC unilaterally, without arm's-length negotiations and without independent third-party analysis.

In its proof of claim, ACC characterizes its claims under the Management Services Agreement as its "Shared Services Claim" and divides it into the following five categories:

| Shared Services Claim | Amount |
|---|---|
| Insurance, Mainframe and Facilities Claim | $7,212,121 |
| Vehicle Lease Claim | $1,457,625 |
| Information Technology, Tax and Payroll Claim | $2,221,316 |
| Employee and Vendor Claim | $1,120,258 |
| Corporate Allocation Claim | $ 77,229 |

However, as these amounts exceed the amounts indicated in the supporting invoices, I find, solely for the purpose of determining feasibility, that the lesser amounts shown in the supporting invoices are due. I also regard it as necessary and appropriate, in determining feasibility, to break those down into subcomponents, depending on whether they are pre- or post-petition claims as to ACC, as the former would be subject to the pre-petition preference set-off by ABIZ, and the latter would not be.

The amount due, derived from ACC's actual invoices, but eliminating those invoiced items that ABIZ already has paid, is as follows:

| Claim (Disputed) | Amount |
|---|---|
| Allocation of Information Technology and Related Costs (3/27/02–10/31/02) | 2,200,353.93 |
| Allocation of Paid Insurance Premiums and Related Costs (policy period from 3/27/02–5/15/03) | 6,740,158.33 |
| Allocation of Fleet Costs | 1,457,625.49 |
| Refund of Payments for Chicago and Phoenix central offices (Oct., Nov., Dec. 2002) | 477,396.00 |
| Amounts due for payments made to Broadwing | 220,862.21 |
| **Claim (Undisputed)** | **Amount** |
| Parking garage | 251,329.51 |
| Allocation of facility and related costs for fleet operations and warehousing [3 invoices] | 2,115.66 |
| Allocation of Tax and Tax Department Related Services [3 invoices] | 20,952.00 |
| Allocation of Millenium and Related Mainframe Costs [3 invoices] | 218,518.14 |

ABIZ does not dispute the last four items on the foregoing list, which are ACC's claims for parking garage rent, facility costs for fleet operations and warehousing, tax and tax department costs, and computer mainframe costs. These undisputed items total about $493,000. A discussion of each of the ACC claims that ABIZ does dispute follows.

*i. Information Technology ($2,200,353)*

ACC's claim for "information technology" is a claim by ACC that ABIZ should bear an allocated share of the costs allegedly incurred by ACC in operating its Information Technology Department in the period from ABIZ's petition date through mid-August 2002, at which time ABIZ took over this function for itself. The majority of this claim (90 of the total of 140 days) arose prior to ACC's own petition date of June 25, 2002. To the extent that this claim is pre-petition as to ACC, ABIZ can set off against this claim its own preference claim arising from the October 2001 asset transfers. This offset eliminates most of ACC's claim for information technology—65%, or $1.43 million, of the $2.2 million total. ABIZ disputes the remaining amount (about $770,000), based principally on a contention that ACC has failed to provide any meaningful documentation to justify its claim, and that when, in the summer of 2002, the two sides divided the Information Technology Department between themselves, little more than one-third of that portion of the ACC department's actually joined ABIZ—a matter that may or may not be dispositive. With ACC having failed to show more on this motion, I can and do estimate it at only 40% for the purpose of feasibility and creation of an appropriate reserve, and thus at $308,000. If ACC provides more persuasive information in the future, I will consider it at that time.

*ii. Insurance premiums ($6,740,158)*

ACC's claim for insurance costs is a claim by ACC that ABIZ should bear an allocated share of insurance premiums that assertedly were incurred by ACC for the benefit of both companies in the period from ABIZ's petition date through May 15, 2003. Of this claim, $1,427,710 of the premiums were incurred by ACC prior to its own petition date and therefore are subject to offset against ABIZ's preference claim. This offset leaves a claimed balance of $5,313,448 that is post-petition as to ACC.

With respect to the $5,313,448 in insurance costs that is post-petition as to ACC, this claim is based on ACC's allocation between itself and ABIZ of the costs of insurance that ACC acquired for both companies and their respective subsidiaries. ABIZ contends that the allocation attributes too much of the overall enterprise's insurance costs to ABIZ, which was a relatively small component of the enterprise. It also notes that the biggest component of this claim—just over 50%—is the cost of workman's compensation insurance, which fails to take into account the different workman's comp risks as between the two companies. ABIZ argues, persuasively, that ACC's allocation of workmen's compensation insurance premiums between ACC and ABIZ is based exclusively on a head count of employees and fails to take into account the fact that, due to differences in the degree of hazard faced by the two companies' respective work forces, ACC personnel, who are largely field employees (and who, for instance, have to climb telephone poles), have substantially higher workers' compensation risk than do ABIZ technical personnel, who primarily work in office settings.

ABIZ also notes that when ACC stopped buying insurance for ABIZ in May 2003 and ABIZ began to purchase insurance for

itself, it was able to do so for only about one-third of the amounts that ACC historically had billed it, even though insurance costs had risen significantly over the prior years, and even though ACC presumably had greater purchasing power due to its larger size. A comparable allocation of ACC's post-petition insurance costs would leave ABIZ responsible for only about one-third of the post-petition amount that ACC claims, or $1,771,149. Solely for purposes of judging feasibility, I estimate it in that amount—as 1/3 of the $5,313,448 post-petition component, or $1,771,000.

### iii. Fleet costs ($1,457,625)

ACC's claim for "fleet" costs seeks to recover costs that assertedly are attributable to ABIZ's subleasing from ACC of some of the motor vehicles that ACC had leased under two master leases. Of this claim, about $189,000 is pre-petition as to ACC and therefore subject to the set-off of ABIZ's preference claim. The portion of the claim that is post-petition as to ACC is about $1.24 million. ABIZ asserts that this claim is inflated, and contends that this claim should be valued at no more than $625,000.

This claim has several components. With respect to the first of them, ABIZ contends that ACC is improperly seeking to recover costs in excess of $200,000 that ACC says it incurred for motor vehicle insurance in the period between May 15 and December 31, 2003. In early 2003, however, ACC notified ABIZ that ACC would discontinue providing insurance for ABIZ as of May 15, 2003. As a result, ABIZ acquired its own insurance for leased vehicles from that date forward. It contends that there is no basis for ACC to seek to impose additional insurance costs on ABIZ for that period, but also, and more importantly, that the element of post-petition benefit to a chapter 11 debtor, required to secure admin expense sta-

tus, is fatally missing. Given this fact, I estimate it at zero.

With respect to the second of them, ABIZ objects to ACC's efforts to recover nearly $36,000 for alleged damage to, and registration costs for, motor vehicles that were subleased to ABIZ. ABIZ states that it never has received any evidence of damage from ACC to show that these vehicles were damaged while they were in ABIZ's possession; ABIZ would agree to reimburse ACC to the extent that such evidence is provided. Based on this, and the ease by which ACC could make the necessary showing if (as I am inclined to believe) ACC was truthful in making this demand, I estimate this at 90%, or about $32,000.

With respect to the third of them, ABIZ contends that ACC is charging ABIZ for various lease-related costs that ABIZ previously paid directly to the lessor, apparently to the extent of about $125,000. (See Movants Exh. 18). ABIZ contends that there is no basis to believe that ACC actually incurred these costs, and is entitled to recover them from ABIZ. As neither side has given me much to work with to make a more focused determination as to liability, I estimate the overcharge credit in this category at 50%, or $63,000.

With respect to all three of those items, ABIZ contends that it is entitled to a credit against them, based on its payment of vehicle rentals of approximately $165,000 for a three-month period (April through June 2003) directly to the lessors. As neither side has given me much to work with to make a more focused determination as to liability, I estimate the credit in this category to be 50% of the $165,000 claimed, or $83,000.

ABIZ asserted that as a consequence of its contentions in this area, the total fleet costs claim should be estimated at no more than $625,000. By reason of the analysis

set forth below, I believe that number to be too low, and a larger amount for it—$762,000—will be assumed when determining the amount to be reserved for these costs. However, they are not of a size sufficient to make the plan non-feasible.

### iv. Central office refund ($477,396)

ACC also is claiming about $477,000 for the cost of renting ABIZ's central offices in Chicago and Phoenix in the three-month period of October, November and December 2002. ABIZ contends that ACC has no entitlement to any part of these amounts.

In 2002, ABIZ entered into contracts for the sale of telecommunications systems that had their central offices in Chicago and Phoenix. Ordinarily, ABIZ would have closed these offices immediately, but these two offices were critical nodes on ACC's IP backbone. ACC therefore asked ABIZ to keep these offices open temporarily, which ABIZ agreed to do in consideration of ACC's agreement to reimburse it for the monthly rental payments on the offices.

In accordance with this agreement, ACC did reimburse ABIZ for the rentals on these two offices for the three-month period in which ABIZ kept them open at ACC's request, which, without dispute, is the actual rent and utilities paid by ABIZ for those two offices for the three months at issue. ACC is seeking a refund of these payments because, under the final terms of ABIZ's agreements with the purchasers of the telecommunications systems, the payments that ABIZ received from the purchasers included amounts attributable to ABIZ's cash-burn rate after execution of the contract but prior to closing, including amounts attributable to the rental costs of the two offices.

ACC's position therefore is that ABIZ has been reimbursed twice—once by the purchasers and once by ACC—for the

same rental costs. This appears to be true, but ABIZ contends that nevertheless, under its agreement with ABIZ, ACC agreed to reimburse ABIZ for the rentals paid to ABIZ's landlord for these offices in exchange for ACC's ability to continue to use the offices for three additional months, and there is nothing in the agreement between ACC and ABIZ that allows ACC to obtain the benefit of whatever concessions ABIZ was able to negotiate with its purchasers.

ABIZ argues that as a result, this particular claim should be estimated at zero. For the purpose of feasibility only, I agree.

### v. Payments to Broadwing ($220,862)

The final component of ACC's claims for amounts allegedly due under the Management Services agreement is a claim for the reimbursement of about $221,000 that allegedly was paid by ACC on behalf of ABIZ to Broadwing, a telecommunications service provider. These payments were made by ACC prior to its petition date for services rendered to ABIZ customers by Broadwing prior to ABIZ's petition date. Therefore, this claim appears to be a pre-petition claim, not an administrative claim, for ACC. But even if it weren't, ABIZ would be entitled to set off its preference claim against this particular claim by ACC. For purposes of feasibility only, I agree with ABIZ that this aspect of ACC's claim therefore should be estimated at zero.

### c. "Circuit Refund" Claim ($1,938,056)

ACC also seeks to recover the sum of about $1.94 million for what it characterizes as a "circuit refund" that allegedly arises under an "ABS Capacity Use Agreement" dated as of September 1, 2001, between ABS New York, one of ABIZ's subsidiaries, as "Supplier," and several "Customers," all of which were affiliated with ABIZ, except for one, ACC

Telecommunications, LLC, which was an affiliate of ACC.

The ABS Capacity Use Agreement was entered into in September 2001, at the same time that the underlying network routes that are subject to the ABS Capacity Use Agreement were conveyed to ABS New York. The Agreement was created in order to establish arrangements under which ABIZ or ACC markets located along this series of regional network rings could obtain future network service at a flat rate. In particular, the Agreement provided that each "Customer" would pay to ABS New York a flat monthly fee, which, in the case of the ACC affiliate, was about $97,000 per month, and that each "Customer" could obtain access to future circuits needs by completing and submitting a form that was attached to the Agreement as an exhibit. However, ACC never made those flat monthly fee payments.

On the record before me so far, it appears likely that ACC would have been able to save a considerable amount if it had made those monthly payments; if it had done so, it would have secured access to those circuits at a materially cheaper rate. But instead, ACC continued to obtain access to ABIZ circuits in accordance with the parties' prior arrangements, and ACC continued to pay for that access in accordance with the prior arrangements. In June 2003, ACC rendered to ABIZ an invoice for reimbursement in the amount of about $1.94 million, representing the difference between (i) what ACC paid to ABIZ for access to circuits under the parties' customary arrangements during the eleven month period between April 2002 through February 2003, and (ii) the monthly payments, none of which ever was made, for which ACC allegedly could have obtained access to circuits under the ABS Capacity Use Agreement had it ordered those circuits in accordance with the Agreement, which, however, it never did.

Whether ACC's failure to pay ABIZ under the ABS Capacity Use Agreement is deemed to be a condition to ACC's claiming the benefits under that contract, or is an outright breach of the contract, which might provide ABIZ with remedies, I must find, solely for the purposes of determining feasibility, that ACC either failed to comply with a condition of the ABS Capacity Use Agreement, breached it, or both. Any of these would deprive ACC of the ability to recover under the ABS Capacity Use Agreement. Solely for the purpose of determining feasibility, I estimate ACC's claim in this regard at zero.

### 6. Counterclaims

ABIZ also showed to my satisfaction, solely for the purpose of determining feasibility, that it continued to provide various telecommunications services—as contrasted to access for network assets, for which it never billed ACC—to ACC in accordance with the parties' prior arrangements and understandings. ABIZ rendered invoices to ACC for these services in accordance with those prior arrangements and understandings, and I find, solely for the purpose of determining feasibility, that there currently are outstanding and past-due balances in the aggregate amount of about $3.5 million. ACC failed to even try to establish a defense to these, and the inference I necessarily must draw is that ACC determined that it should not pay these solely by reason of the efforts of each estate to try to maximize its leverage against the other.

### 7. Amount of Reserve

Based on the foregoing estimated amounts, solely for the purpose of determining feasibility, I conclude that it is more likely than not that ACC's administrative expense claims against ABIZ will not exceed the total below, and that this amount, less the $3,500,000 ACC owes

ABIZ for network services, represents an appropriate reserve:

| Claim | Estimated (or Assumed) Amount |
|---|---:|
| DIP Claim | 0 |
| Network Asset Claim | 2,903,000 |
| Shared Services Claims: | |
| *Disputed:* | |
| Information technology | 308,000 |
| Insurance premiums | 1,771,000 |
| Fleet costs | 762,000 |
| Central office refunds | 0 |
| Payments to Broadwing | 0 |
| *Undisputed:* | |
| Parking garage rent | 251,329 |
| Facility costs for fleet and warehousing | 2,115 |
| Tax and tax department | 20,962 |
| Millenium and mainframe costs | 218,518 |
| Circuit refund | 0 |
| **Total:** | **$6,236,924** |

This $6,236,924 exceeds the $3,500,000 that ACC owes ABIZ, by about $2,737,000. A fair and appropriate amount for ABIZ to reserve is $2,740,000.

### 8. *Other Matters*

As other matters relevant to feasibility—*e.g.,* the adequacy of the capital structure; the earning power of the business; economic conditions; the ability of management; the probability of the continuation of the same management; and any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan—are not disputed, I will not address them at length, other than to say that based on the Nevins affidavit, I have no concerns in that regard.

### Conclusion

For the foregoing reasons, I find that the ABIZ plan satisfies the requirements of Bankruptcy Code section 1129(a)(11).